In the

# United States Court of Appeals
## For the Seventh Circuit

No. 05-2340

CHRISTOPHER RAYGOZA,

*Petitioner-Appellant,*

*v.*

DON HULICK,

*Respondent-Appellee.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 03 C 1727—**Robert W. Gettleman**, *Judge.*

ARGUED FEBRUARY 7, 2006—DECIDED JANUARY 25, 2007

Before BAUER, RIPPLE, and WOOD, *Circuit Judges.*

WOOD, *Circuit Judge.* Although this case comes to us on an appeal from a denial of collateral relief, at base it is a "who-dun-it." Christopher Raygoza was convicted in state court for first-degree murder and attempted murder, but he had an alibi. More than that, he had ten available alibi witnesses, most of whom were not related to him, but his attorney made little effort to investigate his alibi, called only one of those witnesses at trial, and failed to offer telephone records that would have corroborated Raygoza's defense. The state courts rejected Raygoza's claim that he had received constitutionally ineffective assistance of counsel, and the district court concluded that federal habeas corpus relief was unavailable.

We conclude that counsel failed to meet minimum performance standards and that his actions (or lack thereof) prejudiced Raygoza. We therefore reverse.

## I

On June 4, 1997, at approximately 9:45 in the evening, two teenagers were shot at DeArco's Pizzeria, on the southwest side of Chicago. One of them, Miguel Macias, was killed, and the other, Hugo Munoz, was badly injured. According to eyewitnesses, a person flashing gang signs and indicating that he was a "United Latino killer" entered the pizzeria. Macias and Munoz were members of a gang called the United Latino Organization (ULO). After that person left the restaurant, another young man returned with a gun and opened fire. Three members of the ULO who were present at the time identified Raygoza as the gunman and Leslie Matos as the person who first walked into the pizzeria. In addition, Raul Quezada, a young member of the rival Latin Soul street gang, to which Raygoza and Matos belonged, testified that he was at the pizzeria that evening serving as a lookout. Quezada testified that Raygoza, whom he knew as "Froggy," was the shooter.

Other witnesses also supported the State's case. According to the facts as the Illinois Appellate Court recounted them, Matos stood in the doorway of the pizzeria as the violence was unfolding and shouted "kill him, kill him, shoot him." Three witnesses identified the shooter as having a blond pony-tail—a description that matched Raygoza at the time. Other people also testified that someone who looked like Raygoza was on the scene. Jennifer Calatayud testified that she saw Matos and Raygoza outside a party at 62nd Street and Sacramento Avenue around 8 pm. Matos told her that he had "something to do" and would meet her in about 15 minutes. She

waited, and he showed up about an hour later, out of breath. He told her that "the boys" had shot someone at the pizza place on California (DeArco's). Later, Raygoza and Matos were identified in photographic arrays and line-ups as the guilty parties, and they were arrested and charged with first-degree murder and attempted murder, among other things.

Raygoza's account of his actions that evening is completely different: if true, then the police arrested the wrong person for Macias's murder. That evening, Raygoza's mother, Maria Raygoza, celebrated her 40th birthday with friends and family at their home in the far-north suburb of Highland Park, Illinois. According to Mapquest (a popular internet site), Highland Park is approximately 35 miles away from the scene of the shooting, see http://www.mapquest.com; the website estimates that it would take 52 minutes to drive from the center of Highland Park to West 62nd Street and South California Avenue. A total of nine people, including Christopher, were in the Raygoza home that evening. The next morning, on June 5, Maria took Christopher along with her to an errand at the Daley Center in downtown Chicago; later, he went to the southwest side, where his family had lived until December 1996, to see his girlfriend Desiree Moyet. In the early evening, Raygoza called his mother at her office and told her that there had been a shooting in the area and that he was afraid that he might be "pinpointed" for it.

His fears were realized two days later, on June 7, after detectives received a tip that "Froggy" was involved in the shooting. On June 11, a detective had a telephone conversation with Attorney Wendy Morgan, who was Maria Raygoza's boss; Attorney Morgan identified herself as Christopher's attorney. On his behalf, she agreed to an interview between Christopher and the police at her office; the meeting was to take place on June 17. Events overtook

these plans when the police arrested Raygoza on the evening of June 12 at his home in Highland Park, without notifying Morgan.

After his arrest, Raygoza was subjected to a marathon interrogation by the detectives, who refused his requests to consult with his mother or with counsel. Notes from the state's attorney indicate that Raygoza initially said that he was at home on the evening of June 4 with family and friends, but that later he admitted that he had been present at the shooting and that "Lucky" had done it. His story changed again, twice: first he asked if he could say that "Shadow" was the shooter, and eventually, at 10:55 the next morning (some 13 hours into the interrogation), he signed a statement written out by the state's attorney confessing that he was the guilty party. The state trial court suppressed this confession on the ground that the detectives had violated Raygoza's Sixth Amendment right to counsel. The trial proceeded nevertheless. Raygoza, represented by Attorney Thomas Brandstrader, waived his right to a jury.

At the trial, the state called several witnesses who identified Raygoza as the shooter, although they had not known him before the incident. Quezada testified that he was acting as a lookout, and that "Froggy" (Raygoza) had told him to watch for police. Quezada did not witness the shooting itself; when he heard shots from inside the pizzeria, he ran away. Although Calatayud testified that she had seen Raygoza at a party near the pizzeria that evening, police reports indicate that she initially told the police that he had not been there. She changed her story two years later—a fact Brandstrader knew.

Brandstrader conducted almost no cross-examination of the state's witnesses, including Calatayud. He did not call any of the other people who had been at the party, even though their names were in the police report. Al-

though, when it came time for the defense case, Brandstrader raised the defense of alibi, he said only that Raygoza was at home in Highland Park at the time "with his mother, Maria Raygoza . . ., Desiree Moyet . . ., and Noemi Cordova." He never mentioned any of the other guests, nor did he mention the fact that Morgan had called Maria's house during the evening to talk to her and Christopher had answered the telephone. Brandstrader called only one defense witness, Moyet. In his closing argument, the prosecutor hammered on the skimpiness of the evidence supporting Raygoza's alibi: "[W]here is Alexis? Where is mom? Where is his brother? Where is the blond lady? Where is the sister?" The trial court found Raygoza guilty. In doing so, the judge too commented on the fact that Raygoza had only one alibi witness, and a biased one at that (his girlfriend).

After the verdict but before sentencing, Raygoza hired a new lawyer. This attorney filed a motion for new trial based on ineffective assistance of counsel, and attached affidavits of seven alibi witnesses who had been available to testify at trial but had not been called. New counsel also submitted other corroborating evidence, including telephone records and train tickets. The trial judge held a hearing on the motion, but even before the hearing began he expressed skepticism about the value of the proceeding. Seven witnesses testified, all supporting Raygoza's alibi. They were (1) Maria Raygoza, (2) Vincent Raygoza, Christopher's 15-year-old brother, (3) Crystal Raygoza, his 13-year-old sister, (4) Noemi Cordova, a friend of Maria's who had spoken to Christopher several times before arriving at the home and then had seen him there, (5) Luisi Paredes, Cordova's 14-year-old son, (6) Wendy Morgan, and (7) Rodney Adams, Morgan's husband, who confirmed that Morgan had spoken on the telephone at 9:15 pm on June 4 to Christopher (a fact he knew because he recognized Christopher's voice when he

answered the telephone). Other witnesses to the murder testified that Eduardo Lerma ("Lucky") was the one who shot Macias and Munoz, to retaliate for an earlier shooting of Lerma, a Latin Souls member, by a ULO member. Lerma and Raygoza bore a strong physical resemblance to one another.

The State responded with evidence about a woman named Chloe Gavin, who was a former friend and land-lord of Maria Raygoza, who turned out to be a con artist. Gavin was also at the birthday party at the Raygoza home. Morgan had helped an investigator put together a time-line of events relating to Gavin. The prosecutor believed that this timeline was a disguised script for the alibi witnesses. The timeline stretched from October 17, 1996, to June 1, 1998, and thus covered a great deal of territory beyond June 4, 1997.

Attorney Brandstrader explained his decision to call only one alibi witness at the hearing. The first time he ever spoke to Moyet was on the day she testified. He did not want to call Maria because "mothers are always alibis." Although he met with Maria Raygoza approximately 30 times prior to the trial, he somehow never asked her about her activities around the time of the shooting, and so he never learned that June 4 was her birthday, that she had invited friends over, and that she had taken Christopher to the city the next day. Cordova, he thought, would be unreliable, and he failed in his three efforts to serve her with a subpoena. He found other problems with Raygoza's siblings, Vincent and Crystal. As for the tele-phone records, he learned only in September of 1997 about Morgan's conversation with Christopher. His trial strategy instead, he said, was to attack the identifica-tion witnesses. But he never attempted to interview any of the three eyewitnesses who had identified Raygoza, nor did he interview Calatayud or the others at the party. The trial court rejected Raygoza's motion for a new trial and a

motion to reconsider. The Illinois Appellate Court affirmed, and the Supreme Court of Illinois denied leave to appeal.

This habeas corpus petition followed. In denying relief, the district court commented "I don't think I have the discretion to grant your request for an evidentiary hearing. I think it would be futile. If I'm wrong, the Court of Appeals will tell me I'm wrong. I think this is a closer case than most that we see. I'm obviously disturbed by it." Although the state judge had not said anything about the credibility of the witnesses at the post-trial proceeding, the district court assumed that the judge had not believed them. No other reason, in his view, could explain why the judge did not order a new trial.

## II

*Aficionados* of habeas corpus law are familiar with the standards the Supreme Court has established for claims of ineffective assistance of counsel, but we review them here briefly to set the stage for our discussion. The leading case is *Strickland v. Washington*, 466 U.S. 668 (1984), where the Court summarized the two components of such a claim as follows:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

*Id.* at 687. In assessing counsel's performance, "a court must indulge a strong presumption that counsel's con-

duct falls within the wide range of reasonable professional assistance," *id.* at 689. See also *Berkey v. United States*, 318 F.3d 768, 772 (7th Cir. 2003). "[S]tragetic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Strickland*, 466 U.S. at 690-91. With respect to prejudice, the Supreme Court clarified that it is not enough to show that the attorney erred, or that the error had "some conceivable effect on the outcome." *Id.* at 693. But, importantly, "the defendant need not show that counsel's deficient conduct more likely than not altered the outcome in the case." *Id.* Instead, "the defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694. The Supreme Court has reaffirmed this framework repeatedly. See, *e.g.*, *Rompilla v. Beard*, 545 U.S. 374, 380-81 (2005); *Wiggins v. Smith*, 539 U.S. 510, 521 (2003).

Because this case reaches us as a collateral attack from a state court conviction, we do not apply *Strickland* directly. Our consideration is mediated by the standards set forth in 28 U.S.C. § 2254(d)(1) ("AEDPA"), under which a federal court may issue a writ of habeas corpus only if the state court reached a decision that was either contrary to, or an unreasonable application of, clearly established federal law as determined by the Supreme Court. See *Williams v. Taylor*, 529 U.S. 362, 404-06 (2000). Here, it is the Illinois Appellate Court's application of *Strickland* to Raygoza's claim that concerns us. This requires us to ask, as the Supreme Court held in *Williams*, "whether the state court's application of clearly estab-

lished federal law was objectively unreasonable." 529 U.S. at 409. As we have noted before, to be unreasonable is more than to be incorrect in some absolute sense of the term. It means instead a conclusion "lying well outside the boundaries of permissible differences of opinion." *Hardaway v. Young*, 302 F.3d 757, 762 (7th Cir. 2002). With both the standards established by *Strickland* and the restrictions imposed by AEDPA in mind, we turn to the merits of Raygoza's arguments.

## III

It is counsel's performance as a whole that matters, and so it is to that we turn. As an abstract matter, Brandstrader was surely correct to think that it is hard to win on an alibi defense. He may also have been correct to conclude that a defendant is in a weak spot if the only alibi witness he can offer is his mother, or perhaps just a mother and a girlfriend. But generalities fall away when we are dealing with an "n" of one: it is the facts of the particular case, and the particular alibi defense, that matter. And here, counsel's general impressions about alibi defenses affected both his preparation for trial and his presentation of Raygoza's case at trial, all to Raygoza's detriment.

Had Brandstrader gleaned the information from Maria about the evening party that was easily available for the asking, he would have learned that this was not a case where only the mother was willing to vouch for a defendant's alibi. To the contrary, witnesses both related and unrelated to Raygoza could have been called. A consistent story from all of them would have forced the trier of fact to confront the possibility that Raygoza had been mistaken for another young Hispanic male with a blond ponytail. Perhaps the prosecutor would have responded by attempting to impeach the alibi witnesses'

testimony with the "timeline" that Morgan created for Gavin. The idea there was that the timeline (which was created for Gavin and which covered the 20-month period from October 1996 through June 1998) was a "script" for the alibi witnesses for the night of June 4, 1997. Quite a few inferences must be drawn before that timeline destroys the testimony of all or most of the alibi witnesses, however, even if (as the trial judge remarked), the events of June 4 were recorded in "excruciating" detail. It is certainly not such strong rebuttal evidence that our confidence in the outcome of Raygoza's trial is restored because of it.

In a first-degree murder trial, it is almost impossible to see why a lawyer would not at least have investigated the alibi witnesses more thoroughly. As the Supreme Court said in *Strickland*, "strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." 466 U.S. at 690-91. Perhaps Brandstrader had formed an opinion about Raygoza's guilt in his own mind and thought that an alibi would be futile. This, however, would hardly distinguish him from legions of defense counsel who undoubtedly do the same every day, yet who conscientiously investigate their clients' cases before coming to a final decision about trial strategy. At the post-conviction hearing, Brandstrader's explanations for his decision not to call any of the seven additional alibi witnesses Raygoza's new counsel identified were reminiscent of the children's verse "And then there were none." Maria was Raygoza's mother; Vincent, Crystal, and Luis were minors; Cordova could not be specific enough; Wendy Morgan and Rodney Adams might have been impeached by their relationship with Gavin. Even if, however, each of these witnesses might have had vulnerabilities in cross-examination, Brandstrader does not seem to have consid-

ered what impact they would have cumulatively. Instead, he picked off each one and wound up leaving Raygoza (as the prosecutor pointed out) with no one but his girlfriend to corroborate his account.

Although we do not lightly conclude that a state court has unreasonably applied controlling Supreme Court law, we note that the inquiry we must conduct is an objective one. As the Supreme Court wrote in *Williams v. Taylor*, *supra*,

> a federal habeas court making the "unreasonable application" inquiry should ask whether the state court's application of clearly established federal law was objectively unreasonable. The federal habeas court should not transform the inquiry into a subjective one by resting its determination instead on the simple fact that at least one of the Nation's jurists has applied the relevant federal law in the same manner the state court did in the habeas petitioner's case. The "all reasonable jurists" standard would tend to mislead federal habeas courts by focusing their attention on a subjective inquiry rather than on an objective one.

529 U.S. at 409-10. The fact that our inquiry must be objective has another consequence that is important in cases like this one, where the original state trial judge also presided over the post-conviction (or here, new trial) proceeding. It means that we cannot accept as conclusive the judge's statement that the new evidence would not have made any difference to the outcome of the case. See *Hall v. Washington*, 106 F.3d 742, 752 (7th Cir. 1997) (holding that even when a judge who presided over the original trial asserts in a post-conviction proceeding that "[petitioner]'s additional evidence would not have changed his mind . . . [t]his cannot, however, be conclusive"). That said, we naturally give great weight to the judge's assessments, particularly on matters relating to the credibility

of the witnesses who appeared. In the end, however, we have an obligation to take a fresh look at the case and apply the standards set forth in AEDPA.

An objective inquiry into the basis for the court's guilty verdict in Raygoza's original trial reveals that the trial judge was heavily influenced by Raygoza's lack of evidence supporting his alibi. The judge highlighted the fact that "defense presents one witness, the girlfriend. . . . Her testimony is certainly one of a biased witness. . . . I don't have any trouble saying I don't believe that testimony at all." The judge then pointed to the testimony of the prosecution's three witnesses, comparing the original two sets of witnesses in the course of reaching his guilty verdict. At the conclusion of the hearing on the motion for a new trial, the judge summarized the problems he saw with each of the additional witnesses. He did not, however, pay particular attention to the possibility that in the aggregate, they may have provided powerful evidence for Raygoza's alibi, even though individually each one might have been impeached. In short, the record shows that the lack of credible alibi witnesses was a significant, if not dispositive, factor in both the original guilty verdict and the denial of the motion for new trial. That makes this case similar to *Stanley v. Bartley*, 465 F.3d 810 (7th Cir. 2006), in which we found that a lawyer's failure to interview and call substantially all of the available alibi witnesses resulted in a performance that did not meet the minimum standard guaranteed by the Sixth Amendment. *Id.* at 813. As we did there, we conclude here that Raygoza did not receive constitutionally adequate representation.

Raygoza is not entitled to relief, however, unless he also can establish that he was prejudiced by his attorney's deficient performance. In order to do so, he must "show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is

a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. We find this test met as well, even taking into account both the AEDPA standard of review and the fact that the trial judge subjectively believed that the array of additional alibi witnesses would not have swayed his judgment. The State's case against Raygoza was not particularly strong. The only evidence apart from the suppressed confession linking him to the crime was eyewitness identification from rival gang members John Ribota, Hugo Munoz, and Leo Dorado, and a passerby who did not see the shooter's face but was able to give a general description of the clothing the perpetrators were wearing as they fled from the pizzeria. (As we noted recently, social science research has revealed serious problems with eyewitness testimony from a stranger, when it is based only on a fleeting glance. See *United States v. Brown*, 2006 WL 3720245, *1-2 (7th Cir. Dec. 19, 2006). We do not know here whether the shooter was a stranger or Raygoza; the witnesses, however, were nothing like the trained law enforcement officers whose identification we found reliable in *Brown*.) There was nothing so distinctive about Raygoza's clothing to allow the witnesses to rule out countless other suspects. On the other side, Raygoza's alibi witnesses included both family members and unrelated people; their stories were corroborated by telephone records and train tickets. Obviously, a trier of fact approaching the case with fresh eyes might choose to believe the eyewitnesses and to reject the alibi evidence, but this trier of fact never had the chance to do so. This undermines our confidence in the outcome of the proceedings so seriously that we conclude that there is a reasonable probability that the result would have been different had Raygoza's attorney presented the testimony of all or most of his alibi witnesses.

**IV**

We note, prior to concluding, that Raygoza has also argued that his trial counsel was ineffective for failing to conduct a better cross-examination of Jennifer Calatayud. If this had been counsel's only slip, we would have found no reason to criticize the Illinois courts' application of the *Strickland* test. Under the circumstances, however, we see no need to analyze this argument separately: we have found that counsel's performance taken as a whole was deficient, and we have found that Raygoza was prejudiced as a result. Although the Illinois courts identified the correct governing Supreme Court cases, their application of that law was objectively unreasonable. We therefore REVERSE the judgment of the district court. The writ of habeas corpus is GRANTED unless the State of Illinois elects to retry Raygoza within 120 days of issuance of this Court's final mandate, or of the Supreme Court's final mandate.

BAUER, *Circuit Judge*, dissenting. I respectfully dissent.

I cannot agree that the Illinois Courts, particularly the opinion of the Illinois Appellate Court, was wrong, either by State or Federal standards. And that, I believe, keeps us from second guessing. I would affirm the district court's denial of the writ. The recitation of the facts and the rulings are sufficiently outlined in the majority opinion and that of the state trial court, appellate court, and the district court to make any further discussion unnecessary for purposes of this dissent.

No. 05-2340                                                          15

A true Copy:

    Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*
