2021 IL App (1st) 190126-U

SIXTH DIVISION
May 7, 2021

No. 1-19-0126

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the Circuit Court of Cook County. |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | No. 09 CR 09023 |
| | ) | |
| MICHAEL MINNIFIELD, | ) | |
| | ) | Honorable Vincent M. Gaughan, |
| Defendant-Appellant. | ) | Judge Presiding. |

JUSTICE CONNORS delivered the judgment of the court.
Justice Harris concurred in the judgment.
Presiding Justice Mikva concurred in part and dissented in part.

**ORDER**

¶ 1   *Held:*   Circuit court's denial of third-stage postconviction petition after an evidentiary hearing was not manifestly erroneous; affirmed.

¶ 2   Defendant, Michael Minnifield, appeals an order of the circuit court that denied his petition for relief under the Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 *et seq.* (West 2014)) after an evidentiary hearing. On appeal, Minnifield contends that the circuit court's denial was manifestly erroneous because: 1) his trial counsel was ineffective for failing to investigate and call

multiple alibi witnesses, and 2) newly discovered evidence that Minnifield was not the shooter was noncumulative, conclusive evidence that would likely change the result on retrial. We affirm.

¶ 3                                    I. BACKGROUND

¶ 4      On the night of April 20, 2009, Renault Darling was shot and killed in a drive-by shooting near 63rd and Ellis in Chicago. Two people who were with Darling were injured. Minnifield, Kerry Williams, and Angelo Straight were charged with multiple counts of first degree murder, attempted murder, and aggravated battery with a firearm. It was alleged at Minnifield's trial that he was one of the shooters and the rear passenger of the car used in the shooting.

¶ 5                                     A. Jury Trial

¶ 6      We previously summarized Minnifield's jury trial in *People v. Minnifield*, 2014 IL App (1st) 113778-U. At trial, one of the surviving victims, Theodis Cook-Mims, testified for the State in part as follows. Cook-Mims had been a member of the Gangster Disciples, but left the gang in 2008 and moved to Louisville, Kentucky. *Id.* ¶ 7. On the day of the shooting, Cook-Mims was in Chicago for a funeral and to visit Darling. *Id.* Cook-Mims, Darling, and other friends went to buy liquor. *Id.* When they returned to Darling's house, Cook-Mims saw a dark blue Dodge Charger heading in his direction and a beam on his shirt coming from the rear of the car. *Id.* The occupants of the Charger fired shots at his group. *Id.* Cook-Mims heard someone yell, "[Wait] wait. Stop stop. Stop, stop. Wait, wait," before the shooting started again. *Id.* The Charger pulled away slowly. *Id.* Cook-Mims was shot twice and Darling was shot in the neck. *Id.* Cook-Mims went to the hospital, where he did not tell the police who shot at him because he wanted to go back to Kentucky. *Id.* ¶ 8. Later, at the police station, Cook-Mims identified Minnifield as the rear passenger of the Charger. *Id.* Cook-Mims recognized Minnifield from high school, but did not

know him personally. *Id.* Cook-Mims could not definitively identify the driver at the time. *Id.* ¶ 8. Cook-Mims stated at trial that the front seat passenger had a gun. *Id.* ¶ 9.

¶ 7    On cross-examination, defense counsel elicited that Cook-Mims bought some marijuana on the night of the shooting, had just smoked a blunt, and was high before the shooting. *Id.* Defense counsel also emphasized Cook-Mims's grand jury testimony in which he said he was not paying attention to the front seat passenger and did not know if that passenger had a gun. *Id.*

¶ 8    Straight, the alleged driver of the Charger, testified for the State in part as follows. Straight became a member of the Black P Stones gang at age 17 and Minnifield had been one of his closest friends in the gang. *Id.* ¶ 10. The Black P Stones believed that the Gangster Disciples, who commanded an area known as Dro City, were responsible for the deaths of two Black P Stones members, Sergio Dukes and Tommy Williams. *Id.* Straight testified about a rap song, "F*** Dro City," in which he recognized Minnifield's voice as the singer. *Id.* ¶ 11. Straight testified to the interpretation of various phrases, including that the letters "GDK" stood for Gangster Disciple Killer, "RIP Serge, Tommy" referred to deceased Black P Stones members Sergio Dukes and Tommy Williams, and that the song mentioned two Gangster Disciples and several Black P Stones by their nicknames. *Id.*

¶ 9    On the night of the shooting, Straight drove his blue Charger to pick up Williams, who was carrying a .40-caliber Glock that he put in the back door panel, and then Minnifield. *Id.* ¶ 12. The three men went to a liquor store, gas station, studio, the house of Williams's relative for an hour or two, and back to a liquor store. *Id.* Minnifield took the .40-caliber Glock from the back door panel and the men went to Dro City to see if they could "catch" some Gangster Disciples who were not paying attention and shoot at them. *Id.* When they could not find anyone, Minnifield suggested they drive to an area called the Quads to shoot at the man who shot Serge, a deceased

Black P Stone. *Id*. Minnifield collected a .45-caliber gun from a nearby house before they drove to the Quads. *Id*. After waiting 30 minutes without seeing Serge's shooter, the three men went back to Dro City. *Id*. They were traveling north on Ellis toward 63rd Street when they saw approximately seven people on the right side of the street. *Id*. ¶ 13. Straight pulled the car parallel to the group and Williams and Minnifield started shooting out of the windows of the car. *Id*. Straight stopped the car to "make sure people got shot" and then hit the gas. *Id*. Minnifield told Straight to stop again and both Minnifield and Williams kept shooting. *Id*. The three men drove away and dropped off the two guns with someone named Fuzzy. *Id*. As they were headed to get something to eat, they were pulled over by police officers. *Id*.

¶ 10     The next day, Straight told officers he had not been present for the shooting and Minnifield and Williams had "gone on a caper." *Id*. ¶ 14. He also told officers that gunshot residue on his hands was from a gun he had touched earlier on the previous day. *Id*. He later admitted to officers that he was lying about the whole incident. *Id*. In January 2010, he and his attorney spoke with an assistant State's Attorney about the shooting, and on May 13, 2010, he pled guilty to conspiracy to commit murder. *Id*. ¶ 15. Straight was given a sentence of 15 years day-for-day in exchange for his complete and truthful testimony against Minnifield, Williams, and others involved in the shooting. *Id*. Straight acknowledged that he had been untruthful to the State about the origin of the .40-caliber gun that had been used in the shooting and that both guns had actually been purchased by Straight's mother. *Id*. ¶ 16. The State also asked Straight about his prior convictions for a felony drug offense and unlawful use of a weapon. *Id*.

¶ 11     On cross-examination, defense counsel confirmed that Straight was facing a possible sentence of 90 years, but in exchange for his testimony, his sentence was "whittled down" to 15 years, of which he would serve 7½ years. *Id*. ¶ 18. Defense counsel elicited that Straight had two

prior felony convictions, was worried about having a murder conviction on his record, and that he had been looking for a deal from the State. *Id*. Defense counsel also questioned Straight's ability to tell the truth given his track record of lies to police officers and prosecutors about the origins of the guns used in the shooting even after he signed the plea agreement. *Id*. Straight answered "no" to the following questions: if Straight and Williams were the only ones who did the shooting, if only he and Williams had guns that night, and if he picked up Minnifield only after the shooting. *Id*.

¶ 12    An evidence analyst testified that Straight, Williams, and Minnifield each had gunshot residue on their skin and concluded that each of them either discharged a firearm, contacted an item that had primer gunshot residue on it, or had a hand in the environment of a discharged firearm. *Id*. ¶ 20. After explaining what activities might eliminate gunshot residue on skin, the analyst testified that Minnifield had the least gunshot reside of the three men and those particles were mostly on his non-dominant hand. *Id*.

¶ 13    After closing arguments, the jury found Minnifield guilty of first degree murder and aggravated battery with a firearm. *Id*. ¶ 23. Minnifield was sentenced to consecutive 48- and 6-year terms in prison. *Id*.

¶ 14                                B. Direct Appeal

¶ 15    On appeal, Minnifield contended that: 1) the court committed reversible error in admitting the rap song, and 2) the evidence was insufficient to prove him guilty because neither Cook-Mims nor Straight was a credible witness. *Id*. ¶¶ 25-26. This court found no error related to the rap song and that the evidence was sufficient to prove Minnifield's guilt. On November 24, 2014, we affirmed Minnifield's convictions and sentence.

¶ 16                                C. Postconviction Petition

¶ 17    On December 18, 2015, Minnifield filed a postconviction petition through counsel that raised claims of ineffective assistance of counsel and actual innocence, among other claims. The ineffective assistance claim alleged that his trial counsel failed to conduct a thorough and complete investigation, failed to investigate potential alibi witnesses, and further stated in part as follows. In the year-and-a-half between when trial counsel filed his appearance and the start of trial, counsel never visited Minnifield in jail to conduct a detailed interview, review discovery, or discuss strategy or defenses. All conversations with Minnifield occurred in the holding area of the courtroom in the vicinity of other inmates and were never longer than 10 minutes. Further, counsel did not conduct his own investigation or interview any of the State's witnesses. Minnifield told counsel that on the night of the shooting, he was at a party at 61st and Langley from about 6 p.m. until 11 p.m. Minnifield gave counsel the names and phone numbers of potential alibi witnesses. When it became apparent that counsel had not contacted them, Minnifield gave counsel's phone number to the witnesses. Some of the witnesses called counsel, but their calls were not returned. Minnifield's actual innocence claim was based in part on an affidavit from Kevin Watson, who witnessed the shooting and averred that Minnifield was not the rear passenger of the Charger.

¶ 18    Below, we summarize the affidavits attached to the petition that were written by the witnesses who later testified at Minnifield's evidentiary hearing. We also note that a police report that is part of the postconviction record indicates that the shooting occurred at approximately 10:30 p.m.

¶ 19    Minnifield's affidavit and an affidavit attached to an amended petition stated in part as follows. On the night of the shooting, he was at a party at 61st and Langley from 6 p.m. until a little after 11 p.m. There, he talked to Tyesha McClinton and saw Ashley Brock, among others. Brock stayed around Minnifield the entire time he was at the party. Minnifield left the party with

McClinton, Brock, and others, but they went in opposite directions. Outside the party, he saw Straight in the driver's seat of his car and Straight agreed to take Minnifield to a restaurant and drop him off at his girlfriend's house. Minnifield sat in the rear passenger seat behind Williams. After they drove off, they were pulled over by police. Minnifield did not leave the party between 6 p.m. and 11 p.m.

¶ 20    Minnifield further averred that he told his trial attorney, Earl Grinbarg, that several witnesses could verify that he was at the party when the shooting happened and those witnesses would testify if Grinbarg contacted them. While in the courtroom holding area on a few court dates, Minnifield verbally gave Grinbarg the names and phone numbers for Tyesha McClinton and Ashley Brock. Minnifield's mother and sister also told Grinbarg about the alibi witnesses. Grinbarg told Minnifield, "They might say something to harm you, I usually don't contact [alibis] but I'll check into it." Minnifield kept asking Grinbarg whether he talked to the alibi witnesses and Grinbarg always replied that he had not yet done so. With no progress being made, Minnifield gave Grinbarg's phone number to a few of the alibi witnesses. Grinbarg never visited Minnifield in the Cook County jail and never discussed trial strategy with Minnifield.

¶ 21    The affidavit from Minnifield's mother, Alicia Owens, stated in part that on several occasions, Owens insisted to Grinbarg that he call alibi witnesses, especially Ashley Brock. Grinbarg told Owens that he did not visit the jail and did not like calling alibi witnesses because they might say something to harm Minnifield.

¶ 22    The affidavit from Minnifield's sister, Michelle Minnifield[1], stated in part that Ashley Brock told Michelle that she was at a party with Minnifield on the night of the shooting and he did not leave the party until after 11 p.m. Michelle told Grinbarg about Brock and he said he would

---

[1] We refer to Michelle Minnifield as Michelle to avoid confusion.

check into Brock, but he never did. Grinbarg told Michelle that he did not visit jails or call alibi witnesses because they might say something to damage the case.

¶ 23    Tyesha McClinton's affidavit stated in part as follows. On the night of the shooting, McClinton went to a party at 61st and Langley, arriving around 8 p.m. and leaving shortly after 11 p.m. Around 25 to 30 people were at the party. Minnifield, who McClinton knew from the neighborhood, was at the party and did not leave while she was there. McClinton kept noticing Minnifield every 5 to 10 minutes and they talked for about an hour from 10 p.m. to 11 p.m. McClinton and Minnifield left the party together at 11 p.m., but went in different cars. McClinton knew they left at 11 p.m. because she looked at her phone for the time. When McClinton learned that Minnifield was in jail, she told him she would testify about his whereabouts. In May 2011, Minnifield gave McClinton the name and phone number for Grinbarg, and McClinton later spoke with Grinbarg on the phone for about 20 seconds. During the call, McClinton said she was willing to testify and that Minnifield was at the party with her at 10:30 p.m. on the night of the shooting. Grinbarg replied that he was busy and would be in touch, and asked for her name and contact information. Grinbarg never called her back or mailed her anything.

¶ 24    Ashley Brock's affidavit stated in part as follows. On the night of the shooting, she arrived at a party at 61st and Langley around 7 or 7:30 p.m. Brock did not know many people and had not planned to stay long until she saw Minnifield, who she knew through Minnifield's sister. Brock watched him all night and when Minnifield left around 11 p.m., she left too. Brock kept looking at the time because she was 17 years old then and did not want to violate curfew. When Brock learned that Minnifield had been arrested, she told Minnifield's sister and mother she would help and to give her phone number to whoever needed it. No one ever called Brock about the case except for Minnifield's family.

¶ 25    Also attached to the petition was an affidavit from Rasheed Johnson, another attendee of the party at 61st and Langley. Johnson averred in part that at 10:30 p.m. on the night of the shooting, Minnifield was at the party, sitting on the couch and talking to a girl who left with him at 11 p.m. Johnson had wanted to testify at Minnifield's trial, but no one asked him to do so and he did not know how to go about it.

¶ 26    An affidavit from Kevin Watson, which supported the actual innocence claim, stated in part as follows. Around 10:30 p.m. on the night of the shooting, Watson was standing on a porch on the west side of the street at 63rd and Ellis. A dark colored Charger pulled up, in which the driver was Angelo Straight and the front passenger was Kerry Williams, who appeared to be asleep. Watson did not know the rear passenger, but saw his face. Minnifield was not in the car—a fact Watson was sure of because Watson had a clear opportunity to view the inside of the car. Watson knew the men in the car to be Black Stones. Straight reached over Williams and fired shots out of the passenger window and the rear passenger also fired shots. The car pulled off about 10 feet and stopped as more shots were fired into a crowd of people standing on the street. The car drove away and Watson quickly left the scene. Watson started corresponding with Minnifield's ex-girlfriend in September 2012.

¶ 27                         D. Third-Stage Evidentiary Hearing

¶ 28    Minnifield's petition advanced to a third-stage evidentiary hearing, where the following testimony was presented.

¶ 29    Earl Grinbarg, Minnifield's trial counsel, testified in part that he did not have the file from Minnifield's case because he had to dispose of all his files after a flood in his basement. Grinbarg further stated as follows. Minnifield had been represented by a public defender before Grinbarg was hired. All visits with Minnifield took place in the courtroom's holding area. The trial judge

had arranged for defendants to be brought to the courtroom early, so Grinbarg also arrived early so he and Minnifield could talk. Grinbarg did not take notes during these conversations because "[t]here was nothing *** to take notes of." According to Grinbarg, Minnifield told him that "he was with those two guys, they were driving, and *** the police stopped them." Minnifield said that the three men were at a party before he was arrested. Minnifield did not say that he was at a party at the time of the shooting. Grinbarg asked Minnifield, but Minnifield did not specifically tell him when, how, and why he got into the Charger.

¶ 30    Postconviction counsel confronted Grinbarg with a police report in which Minnifield stated that on the night of the shooting, after going to a music studio with Straight and Williams, they all went to 61st and Langley to play cards and drink. Grinbarg stated he "obviously" would have read Minnifield's statement and he went over the police reports with him. Grinbarg did not recall Minnifield telling him that when he left the party, he saw "these guys" and got into the car to get food. Grinbarg did not ask Minnifield if there were witnesses he could talk to. Minnifield never gave Grinbarg the names of any people that he wanted Grinbarg to talk to.

¶ 31    Grinbarg also testified about his interactions with Minnifield's mother, Alicia Owens.[2] Grinbarg and Owens spoke about every month in the Markham courthouse parking lot because Owens did not want to come to Grinbarg's office. Grinbarg did not specifically recall Owens saying anything about interviewing witnesses, but if she did, his standard answer would have been that the witnesses must come to his office, which no one ever did. Grinbarg denied telling Owens that he did not visit jails or that he was not comfortable calling alibi witnesses. He did not remember Owens giving him phone numbers for alibi witnesses and did not recall the names

---

[2] Grinbarg referred to Minnifield's mother as Mrs. Minnifield. We refer to her as Alicia Owens for consistency with Minnifield's postconviction petition and her own testimony at the evidentiary hearing.

Tyesha McClinton, Ashley Brock, or Rasheed Johnson. Grinbarg did not remember receiving calls from Tyesha McClinton or Ashley Brock. Grinbarg also did not remember Minnifield's sister telling Grinbarg that there were witnesses that he probably wanted to call. Owens never complained or suggested any other approach to the case while the case was pending or during trial. Grinbarg and Owens had very polite conversations "up to the very end when she asked me to handle the appeal," although Grinbarg did not do appeals.

¶ 32    Grinbarg further testified that his trial strategy was to assert that Straight and Williams were the shooters. When he first started representing Minnifield, the only evidence against him was the gunshot residue and the testimony of Cook-Mims, who was drunk, stoned, and had limited ability to identify someone. Cook-Mims never named Minnifield, but later said "he knew who it was," which was almost like no identification at all. Straight later entered the picture, but had no credibility because he did not make a statement resembling his trial testimony "until he was given this lotto ticket." The gunshot residue was on Minnifield's nonshooting hand and was miniscule, while Straight and Williams each had substantial amounts on their hands. Grinbarg planned to argue that the gunshot residue transferred to Minnifield's hands and he was inadvertently in the car with two assassins, but never fired a shot. Grinbarg did not need a strategy to explain how Minnifield got into the car. Indeed, Grinbarg wanted Minnifield in the car to explain the transfer of the gunshot residue and assert that Straight and Williams were the shooters. Based on all this, Grinbarg thought the strategy of reasonable doubt—which the public defender had previously asserted—"was right on." According to Grinbarg, Minnifield "looked like a young Bruno Mars. I told him he's going to sit there and look like a choir boy, and if he doesn't hit the stand, I don't think anybody's going to believe he could be a shooter."

¶ 33    Minnifield's mother, Alicia Owens, testified that Minnifield complained to her that Grinbarg was not visiting him in jail. Grinbarg told Owens, "I don't do jails." Minnifield told Owens that he was at a party at the time of the shooting and gave her names of people who were present, which Owens passed on to Grinbarg. Those names included Tyesha McClinton, Ashley Brooks [*sic*], and Rasheed Johnson. Owens did not provide Grinbarg with phone numbers for the witnesses. Grinbarg told Owens he would not call any of the witnesses because they would harm the case. Owens later testified that Michelle also gave her the names of Tyesha McClinton and Ashley Brock, and that she learned of Rasheed Johnson's name through the neighborhood, and not through Michelle or Minnifield. Owens acknowledged that her affidavit only mentioned Ashley Brock and the affidavit did not state that Minnifield gave her the names of Tyesha McClinton and Ashley Brock.

¶ 34    Minnifield's sister, Michelle, testified that Minnifield told her that he was at a party on the night of the shooting and he gave her names of people who were at the party, including Tyesha McClinton and Rasheed Johnson. Michelle worked with Ashley Brock, which is how she learned that Brock was at the party. Michelle was present when her mother relayed the information about Tyesha McClinton and Ashley Brock to Grinbarg. Michelle and her mother gave Grinbarg the witnesses' phone numbers and Grinbarg said he would look into it. According to Michelle, Tyesha McClinton and Ashley Brock each tried calling Grinbarg. Tyesha McClinton briefly spoke with Grinbarg, but he did not call her back. Ashley Brock told Michelle that she left a message, but Grinbarg did not call her back either. Michelle acknowledged that her affidavit did not mention Tyesha McClinton and Rasheed Johnson.

¶ 35    Tyesha McClinton testified that she had known Minnifield since childhood. On the night of the shooting, McClinton was at a gathering on 61st and Langley. She saw Minnifield when she

arrived around 8 p.m. Around 10 p.m., they had a conversation on a couch. McClinton looked at her phone every 5 to 10 minutes. A little after 11 p.m., McClinton and Minnifield walked out of the party together and went their separate ways. Months later, McClinton learned that Minnifield had been charged with the shooting and spoke with him when he was in jail. Minnifield showed proof via a "police report or something" that he was with McClinton at the time of the shooting and gave her Grinbarg's phone number. Later, McClinton called Grinbarg and told him she was a witness for Minnifield's case. Grinbarg said he was busy, asked for her contact information, and told her he would get back to her. McClinton was never called back.

¶ 36    Ashley Brock testified that she worked with Michelle, knew the Minnifield family from the neighborhood, and was at a party on Langley on the night of the shooting. Minnifield was already at the party when Brock arrived between 7 and 7:30 p.m. Brock told Minnifield that she may need him to take her home. Brock went back and forth between speaking with Minnifield and others. She left a little after 11 p.m. and remembered that time because she had her phone and looked at a television that was playing a news channel. Brock and Minnifield walked out together and Brock got a ride from a friend. Brock kept track of Minnifield at the party because she did not want him to leave her there and she recalled that he never left before she did. Brock told Michelle to give the defense attorney her phone number, but was not called.

¶ 37    Rasheed Johnson testified that he grew up with Minnifield. Johnson was currently incarcerated and was a member of the Black P Stones in 2009. On the night of the shooting, Johnson arrived at a party at 61st and Langley around 9 p.m. and left around 1 a.m. When Johnson arrived, Minnifield was sitting on the couch. Johnson spoke to Minnifield at various times during the party. Around 11 p.m., Minnifield let Johnson know he was leaving and then left the party with a girl who had been on the couch with him. Johnson did not remember if Minnifield came up to

him before leaving, but he saw Minnifield leave. After Minnifield's arrest, Johnson told Minnifield's mother that Minnifield was at the party. Minnifield's mother told Johnson she would have a lawyer contact him, but that did not occur.

¶ 38    Kevin Watson, the witness supporting Minnifield's actual innocence claim, testified that he did not know Minnifield or his family in 2009 and was currently incarcerated. At about 10:30 p.m. on the night of the shooting, he was on the west side of 63rd and Ellis and saw a blue car coming down the street. Watson was about 10 or 15 feet away from the car, which had a light on inside, and he saw three occupants inside. Straight, who Watson knew from the neighborhood, was the driver and fired shots out of the passenger side at a group of people standing on the east side of the street. Williams, who Watson also knew from the neighborhood, was slouched over and appeared to be asleep. The rear passenger, who Watson had seen before but did not know, was shooting as well. Watson saw the sides of the occupants' faces and stated, "In a sense, *** yes," when asked if the shooters were turned away from him. Watson estimated that he looked at the rear passenger for about five seconds. Watson was scared and left the scene after the shooting. One day while in prison, Watson called some friends who were having a picnic. He asked to put a woman on the phone and he spoke to Treasure Hilliard, who told Watson that she had an ex-boyfriend—Minnifield—who was also in prison. Watson and Hilliard discussed Minnifield's case. Watson told Hilliard he was present for the shooting and he wanted to help, so he prepared an affidavit and sent it to Hilliard. Watson knew that Minnifield had not been in the blue car because Hilliard sent Watson pictures of a group of people that included Minnifield and told Watson "it couldn't be him. It wasn't him." Hilliard had written on the back the names of the people in the pictures. According to Watson, the person in Hilliard's pictures that she said was Minnifield was

not the rear passenger of the blue car. At the hearing, after defense counsel asked Watson to look at Minnifield in court, Watson stated that Minnifield was not the rear passenger of the blue car.

¶ 39     Minnifield testified as follows about his whereabouts on the night of the shooting. Minnifield, Straight, and Williams arrived at a party at 61st and Langley around 6 p.m. Minnifield stayed at the party until a little after 11 p.m. While at the party, Minnifield branched off from Straight and Williams and mingled with various people. Minnifield knew he left a little after 11 p.m. because he had been sitting on the couch talking to Tyesha McClinton, who had her phone out. Many other people also left the party at that time, including Ashley Brock. Once he left, Minnifield saw Straight's car, where Williams was in the front seat, and asked Straight to drop him off at his girlfriend's house. Minnifield denied that at one point he had a girlfriend named Treasure.

¶ 40     Minnifield testified as follows about his interactions with Grinbarg. Minnifield told Grinbarg his whereabouts on the night of the shooting and that there were people who would testify for him. Minnifield gave Grinbarg the names of witnesses he wanted called, but Grinbarg never wrote down any names or called them. He told Minnifield that he did not like to call alibi witnesses because they might say something to damage the case.

¶ 41     Other witnesses also testified at the evidentiary hearing, but their testimony is not germane to the issues raised in this appeal.

¶ 42     After closing arguments, the circuit court found that Minnifield did not make a substantial showing of a violation of his constitutional rights and denied his petition. The court stated in part as follows in its oral ruling. The matter "[boiled] down to a matter of credibility." The testimonies of Minnifield's witnesses had inconsistencies and omissions and the State's witnesses were "considerably more credible." Trial counsel was not ineffective and Minnifield did not fulfill either

prong of the analysis from *Strickland v. Washington*, 466 U.S. 668 (1984). Further, because Watson had "little if any credibility," there was not much evidence to support the actual innocence claim.

¶ 43    Minnifield timely appealed.

¶ 44                                  II. ANALYSIS

¶ 45    Minnifield asserts that his ineffective assistance and actual innocence claims warrant a new trial. We address each claim in turn.

¶ 46                        A. Ineffective Assistance of Counsel

¶ 47    Minnifield contends that his trial counsel, Earl Grinbarg, was ineffective because he did not investigate and call multiple alibi witnesses who would have testified that Minnifield was at a party during the shooting. Minnifield argues that the testimony of the alibi witnesses would have changed the outcome of the trial. Minnifield further asserts that the circuit court's ruling was based on unsupported credibility findings and the circuit court did not identify anything about Minnifield's witnesses that suggested they were not credible. According to Minnifield, Grinbarg was untrustworthy where he admitted that he never took notes during his conversations with Minnifield and conveniently claimed that all his files were destroyed in a flood. Minnifield states that the alibi witnesses' consistent and unwavering testimony established that Grinbarg knew there was evidence to support an alibi defense.

¶ 48    The Act provides a way for defendants to challenge their convictions or sentences for violations of federal or state constitutional rights. *People v. Pendleton*, 223 Ill. 2d 458, 471 (2006). Postconviction proceedings consist of a three-stage process (*People v. English*, 2013 IL 112890, ¶ 23), which begin when the defendant files a petition in the circuit court where the original proceeding took place (*People v. Hodges*, 234 Ill. 2d 1, 9 (2009)). The petition must set forth the

ways that the defendant's constitutional rights were violated. *Id*. If the petition is not frivolous or patently without merit, it advances to the second stage, where counsel is appointed if necessary and the State may file responsive pleadings. *Id*. at 10-11. The second stage of review tests the legal sufficiency of the petition and the allegations are taken as true unless they are affirmatively rebutted by the record. *People v. Domagala*, 2013 IL 113688, ¶ 35. If the defendant makes a substantial showing of a constitutional violation, then the petition advances to a third-stage evidentiary hearing. *Id*. ¶ 34. There, the circuit court serves as the fact finder and determines witness credibility, decides the weight to give to the testimony and evidence, and resolves any evidentiary conflicts. *Id* "[T]he circuit court must determine whether the evidence introduced demonstrates that the [defendant] is, in fact, entitled to relief." *Id*. The defendant has the burden to make a substantial showing of a deprivation of constitutional rights. *People v. Coleman*, 206 Ill. 2d 261, 277 (2002).

¶ 49    We will not reverse the circuit court's decision after an evidentiary hearing unless it is manifestly erroneous. *English*, 2013 IL 112890, ¶ 23. Manifest error is error that is clearly evident, plain, and indisputable. *People v. Jackson*, 2020 IL 124112, ¶ 98. Our standard of review "recognizes that we must give great deference to the trial court's factual findings because the trial court stands in the best position to weigh the credibility of the witnesses." (Internal quotation marks omitted.) *People v. Hotwagner*, 2015 IL App (5th) 130525, ¶ 31.

¶ 50    To establish ineffective assistance of counsel, a defendant show that: 1) counsel's performance was deficient, and 2) the deficient performance prejudiced the defense. *Strickland*, 466 U.S. at 687. Effective assistance of counsel refers to competent, not perfect, representation. *People v. Palmer*, 162 Ill. 2d 465, 476 (1994). Counsel's performance is measured by an objective standard of competence under prevailing professional norms. *People v. Richardson*, 189 Ill. 2d

401, 411 (2000). A defendant must overcome the strong presumption that the challenged action or inaction might have been the product of sound trial strategy. *Id*. Of note, decisions about whether to call certain witnesses on the defendant's behalf are matters of trial strategy that are reserved to counsel's discretion. *People v. Enis*, 194 Ill. 2d 361, 378 (2000). Counsel has a duty to make reasonable investigations or make a reasonable decision that makes particular investigations unnecessary, and the reasonableness of a decision to investigate is assessed with "a heavy measure of deference to counsel's judgment." *People v. Pecoraro*, 175 Ill. 2d 294, 324 (1997). That another attorney might have pursued a different strategy, or that counsel's chosen strategy was unsuccessful, does not mean that counsel was ineffective. *People v. Fuller*, 205 Ill. 2d 308, 331 (2002). The principle that matters of trial strategy are generally immune from ineffective assistance claims does not apply where counsel's strategy was so unsound that he did not conduct any meaningful adversarial testing. *Enis*, 194 Ill. 2d at 378.

¶ 51     The evidentiary hearing presented a choice between believing Grinbarg or Minnifield's witnesses. Grinbarg claimed that he was never told of alibi witnesses. In contrast, Minnifield and his witnesses maintained that Grinbarg refused to investigate and speak with witnesses even though they were made available. We defer to the circuit court's finding that Grinbarg was more credible. "The postconviction trial judge is able to observe and hear the witnesses at the evidentiary hearing and *** occupies a position of advantage in a search for the truth which is infinitely superior to that of a tribunal where the sole guide is the printed record." (Internal quotation marks omitted.) *People v. Coleman*, 183 Ill. 2d 366, 384 (1998). Further, there were inconsistences among Minnifield's witnesses. Owens stated that she did not provide Grinbarg with phone numbers, while Michelle stated that she and Owens indeed provided him with phone numbers. Owens testified inconsistently about where she learned about Rasheed Johnson. Owens's and

Michelle's testimonies at the hearing referenced names that were not mentioned in their affidavits. Michelle stated that Ashley Brock called Grinbarg, but Brock did not testify to that. Faced with competing accounts, and deferring to the circuit court's ability to see and hear the witnesses, we have no basis to disturb the circuit court's credibility finding.

¶ 52    Accepting Grinbarg's testimony that he was not told about alibi witnesses, he cannot be ineffective for failing to call them. "Where circumstances known to counsel at the time of his investigation do not reveal a sound basis for further inquiry in a particular area, it is not ineffective for the attorney to forgo additional investigation." *Pecoraro*, 175 Ill. 2d at 324. Further, the police report, which Grinbarg acknowledged he would have seen, did not necessarily indicate that he should look for witnesses who were at the party. According to the report, Minnifield told police he was at 61st and Langley before he was arrested, but the report does not indicate that Minnifield stated he was at 61st and Langley at the specific time of the shooting. In a similar vein, Grinbarg was not impeached by the police report, contrary to Minnifield's assertion on appeal. Grinbarg testified that Minnifield told him he was at a party before he got arrested, but he did not tell Grinbarg he was at a party at the time of the shooting. That is entirely consistent with the contents of the police report.

¶ 53    Even if the police report and Minnifield's statement to Grinbarg suggested a potential alibi defense, Grinbarg's chosen strategy—to rely on reasonable doubt—did not render his performance deficient. In evaluating counsel's performance, we must make every effort to "eliminate the distorting effects of hindsight, *** reconstruct the circumstances of counsel's challenged conduct, and *** evaluate the conduct from counsel's perspective at the time." *Strickland*, 466 U.S. at 689. Again, deferring to the circuit court's credibility findings, Grinbarg did not have any names of alibi witnesses. He pursued a strategy of asserting reasonable doubt. Per his testimony, Grinbarg

identified weaknesses in the State's case that he later targeted at trial, including that Cook-Mims and Straight had limited credibility. At trial, Grinbarg elicited that Cook-Mims was high before the shooting and his inconsistent grand jury testimony. Grinbarg's cross-examination of Straight highlighted his plea deal and his previous lies to law enforcement. Minnifield's small amount of gunshot residue supported the theory that the gunshot residue was transferred to Minnifield's hands without him shooting a gun. Grinbarg subjected the case to meaningful adversarial testing and his strategy was reasonable given the apparent weaknesses in the State's case.

¶ 54    Minnifield's discussion of *Raygoza v. Hulick*, 474 F.3d 958 (7th Cir. 2007), and *People v. King*, 316 Ill. App. 3d 901 (2000), does not change our conclusion. In *Raygoza*, 474 F.3d at 961-64, trial counsel was ineffective where he raised an alibi defense, but did not support it with available evidence, including telephone records, train tickets, and potential alibi witnesses who were listed in a police report. Here, Grinbarg chose an entirely different strategy and did not have evidence that would have supported an alibi defense. In *King*, 316 Ill. App. 3d at 916, the court found that trial counsel was deficient for not calling an alibi witness to testify where the witness would have bolstered an otherwise uncorroborated defense and neither counsel nor the State explained why counsel did not call the witness. Here, Grinbarg testified did not recall being given names or phone numbers for alibi witnesses and did not remember receiving calls from two of them. Grinbarg's approach was to focus on reasonable doubt. We accept the circuit court's finding that Grinbarg was credible. Grinbarg was not deficient for failing to investigate and call alibi witnesses whose identities he was not aware of, and for choosing to pursue a different strategy that was based on available evidence.

¶ 55    Minnifield also cites to other cases where counsel was deemed ineffective for failing to interview or present witnesses: *People v. Tate*, 2012 IL 112214, *People v. Makiel*, 358 Ill. App. 3d

102 (2005), *People v. Morris*, 335 Ill. App. 3d 70 (2002), and *People v. Skinner*, 220 Ill. App. 3d 479 (1991). *Tate* was an appeal from a first-stage dismissal. *Makiel*, *Morris*, and *Skinner* all involved petitions that were dismissed without an evidentiary hearing. The findings that counsel was ineffective in those cases do not apply to a third-stage evidentiary hearing, where the circuit court determines the credibility of witnesses, weighs testimony and evidence, and resolves evidentiary conflicts. *People v. Domagala*, 2013 IL 113688, ¶ 34.

¶ 56    Grinbarg was not deficient for failing to investigate and call alibi witnesses. Because the failure to show either deficient performance or prejudice defeats an ineffective assistance claim (*Palmer*, 162 Ill. 2d at 475), we need not address whether Minnifield was prejudiced. The circuit court properly denied Minnifield's ineffective assistance claim.

¶ 57                                        B. Actual Innocence

¶ 58    We next address Minnifield's actual innocence claim. Minnifield contends that the newly discovered testimony of Kevin Watson, who implicated another man in the shooting, is noncumulative, conclusive evidence that would likely change the result on retrial. Minnifield asserts that Watson's testimony goes to the central issue in the case and is probative of whether Minnifield was one of the shooters. Minnifield further argues that Watson's testimony would add substantial strength to the defense where the State's case was based on unbelievable testimony and no physical evidence directly linked him to the shooting. Minnifield also asserts that the circuit court's finding that Watson had "little if any credibility" was not a proper ground for denying the petition. Minnifield contends that the ultimate task of determining Watson's credibility is for the trier of fact, and not the judge presiding over postconviction proceedings.

¶ 59    The due process clause of the Illinois Constitution permits defendants to assert a freestanding claim of actual innocence based on newly discovered evidence. *People v. Orange*,

195 Ill. 2d 437, 459 (2001). Actual innocence is not the same as sufficiency of the evidence or reasonable doubt, or impeachment of trial witnesses, "but a claim of vindication or exoneration." *People v. Mabrey*, 2016 IL App (1st) 141359, ¶ 23. A court should grant relief only if the defendant has presented supporting evidence that is new, material and noncumulative, and of such conclusive character that it would probably change the result on retrial. *People v. Coleman*, 2013 IL 113307, ¶ 84. Evidence is newly discovered if it was not available at the original trial and the defendant could not have discovered it sooner through diligence. *People v. Morgan*, 212 Ill. 2d 148, 154 (2004). Material means the evidence is relevant and probative of the defendant's innocence. *Coleman*, 2013 IL 113307, ¶ 96. Noncumulative means the evidence adds to what the jury heard. *Id*. The new evidence "need not be entirely dispositive" to be likely to change the result on retrial. *People v. Robinson*, 2020 IL 123849, ¶ 56. Rather, the defendant must present evidence "that places the trial evidence in a different light and undermines the court's confidence in the judgment of guilt." *Id*. "Probability, not certainty, is the key as the trial court in effect predicts what another jury would likely do, considering all the evidence, both new and old, together." *Coleman*, 2013 IL 113307, ¶ 97.

¶ 60    The evidence from Watson's affidavit and testimony is newly discovered. Watson stated that he left the scene after the shooting because he was scared. He further stated that he did not know Minnifield or Minnifield's family in 2009 and only came forward after he started talking to Treasure Hilliard in 2012, which was after Minnifield's trial. Watson's affidavit and testimony are also material and noncumulative. Watson testified about the ultimate issue in the case—whether Minnifield was one of the shooters—and contradicted the other eyewitnesses who testified at trial.

¶ 61    Yet, the evidence provided by Watson is not conclusive. In reaching this conclusion, we note that the circuit court properly considered whether Watson was credible. Determining whether

newly discovered evidence places the trial evidence in a different light "is a comprehensive approach and involves credibility determinations that are uniquely appropriate for trial judges to make." *Id.* Further, the circuit court's finding that Watson had little if any credibility was not manifestly erroneous. The circumstances surrounding Watson's decision to write an affidavit raise questions about the accuracy of Watson's identification of the rear passenger. By happenstance, Watson began talking to Treasure Hilliard after calling some friends who were at a picnic. Watson stated that Hilliard was Minnifield's ex-girlfriend, but Minnifield denied that he had an ex-girlfriend with that name. Hilliard sent Watson pictures of someone she indicated was Minnifield and told Watson that this person was not the shooter. Watson did not have independent knowledge of what Minnifield looked like before he spoke with Hilliard. Further, Watson had limited ability to view the occupants of the car. Watson testified that he only saw the sides of the occupants' faces and admitted that the shooters were "in a sense" turned away from him. Watson was on the opposite side of the street from where the shooting took place. Based on the shortcomings in Watson's testimony, the circuit court properly found that Watson was not credible. Moreover, a new witness's lack of credibility can be a basis for finding that new evidence is incapable of changing the result on retrial. See *People v. Carter*, 2017 IL App (1st) 151297, ¶¶ 142-44, 147 (evidence was incapable of changing the result on retrial where the witnesses who testified at the evidentiary hearing that the defendant was not the shooter were not credible).

¶ 62 Minnifield relies on *People v. Ortiz*, 235 Ill. 2d 319 (2009), to assert that Watson's evidence is conclusive and warrants a new trial. There, a newly discovered witness, who knew the defendant at the time of the offense, testified at the evidentiary hearing that he saw two other people shoot the victim and the defendant was not involved. *Id.* at 326-27. The trial court found the testimony insufficient to warrant a new trial because it was cumulative. *Id.* at 327. On appeal, our supreme

court found that all three requirements for an actual innocence claim were met, including that the new evidence was conclusive. *Id.* at 336-37. The court noted that the circuit court had not made any findings about the witness's credibility and that the State had been unable to discredit the witness's testimony at the hearing. *Id.* at 334, 337.

¶ 63     Here, in contrast, the circuit court explicitly found that Watson had little if any credibility, a finding that was not manifestly erroneous. Given his limited credibility, Watson's testimony would be unlikely to change the result on retrial. At the jury trial, two eyewitnesses—one in the car and one on the street—identified Minnifield as one of the shooters. Those eyewitnesses had flaws in their testimony, but Watson's testimony, with its own significant credibility issues, does not undermine confidence in the trial court's judgment of guilt. The evidence from Watson's affidavit and testimony was not conclusive and the circuit court properly denied Minnifield's actual innocence claim.

¶ 64                                  III. CONCLUSION

¶ 65     For the foregoing reasons, the judgment of the circuit court is affirmed.

¶ 66     Affirmed.

¶ 67     PRESIDING JUSTICE MIKVA, concurring in part and dissenting in part.

¶ 68     I agree with the majority that, as to Mr. Minnifield's actual innocence claim, the trial court's decision is not manifestly erroneous and that we should defer to that court's findings in rejecting that claim. However, on Mr. Minnifield's claim that his trial counsel was ineffective, I respectfully dissent.

¶ 69     A police report from the night of the shooting, which was also the night that Mr. Minnifield was arrested, reflects that he immediately told the police that he had been at a party that night. At the evidentiary hearing, Mr. Minnifield, his mother, his sister, and three alibi witnesses—Tyesha

McClinton, Ashley Brock, and Rasheed Johnson—all gave testimony that supported Mr. Minnifield's claim that Mr. Grinbarg, Mr. Minnifield's trial counsel, was repeatedly told that there were multiple alibi witnesses who would testify that Mr. Minnifield was at the party when the shooting occurred.

¶ 70    Ms. McClinton, Ms. Brock, and Mr. Johnson all testified that they were with Mr. Minnifield at this party. They each explained, in some detail, how it was that they knew Mr. Minnifield was at the party at 10:30, which everyone agrees was the time these shootings occurred. They each testified that he left at about 11:00 p.m. and explained how it was that they knew the time of his departure. In addition, each of these three witnesses testified that they let Mr. Minnifield's mother or sister know that they were willing to testify and that his lawyer should call them. Ms. McClinton actually called Mr. Grinbarg, herself and let him know that she was available to testify. She testified that he told her he was busy but would call her back, which he never did.

¶ 71    The testimony of Ms. McClinton, Ms. Brock, and Mr. Johnson was confirmed by testimony from Mr. Minnifield, his mother, and his sister, all of whom testified that they repeatedly told Mr. Grinbarg that there were alibi witnesses who wanted to testify and gave him names and numbers for these witnesses. Mr. Minnifield and his mother testified that Mr. Grinbarg told them he did not like to call alibi witnesses while his sister said the lawyer had said he would look into it.

¶ 72    Mr. Grinbarg's testimony was that he had lost all of his files in a flood, so he had no record of having represented Mr. Minnifield. He testified that he had no memory of ever being told the names of any alibi witnesses. He testified that he assumed he would have reviewed the police report but claimed because it only said that Mr. Minnifield was at a party that night this would not have suggested to him that Mr. Minnifield was at the party when the shooting occurred. He also claimed that Mr. Minnifield never told him he was at the party when the shooting occurred or

suggested that other witnesses could verify that. He admitted that he never visited Mr. Minnifield in jail, never took any notes of their conversations, and never asked him whether he was still at the party at the time of the shootings.

¶ 73    As the majority recognizes, the evidentiary hearing "presented a choice between believing Grinbarg or Minnifield's witnesses." The majority defers to the circuit court's finding that Mr. Grinbarg was more credible. But Mr. Grinbarg's testimony at the hearing was little more than an absence of recollection, unsupported by any circumstantial evidence and contrary to contemporaneous documentation. On the other hand, there were six witnesses, three of whom are unrelated to Mr. Minnifield, who gave testimony that supported Mr. Minnifield's claim that this lawyer was told about—but never investigated—an alibi defense. Mr. Grinbarg's failure to follow up on the multiple accounts that Mr. Minnifield was at party during the time of the shooting was objectively unreasonable. See *People v. King*, 316 Ill. App. 3d 901, 916 (2000) (finding trial counsel's strategy "designed to attack the credibility of only one of the State's three occurrence witnesses was objectively unreasonable" where there was an available alibi witness counsel could have called). It is not sound trial strategy to rely on "reasonable doubt" while ignoring a well-supported alibi defense, as an alibi defense would only enhance the amount of doubt the trier-of-fact would have concerning Mr. Minnifield's guilt.

¶ 74    It is also apparent to me that Mr. Minnifield was prejudiced by his lawyer's deficient performance. This defense would have been supported by at least three witnesses unrelated to Mr. Minnifield or to the charged offense. This alibi evidence was consistent with the police report and with the physical evidence, since Mr. Minnifield had minimal gun residue and only on his non-dominant hand. With this alibi testimony the defense might well have persuaded a jury, as Mr.

Minnifield testified at the evidentiary hearing, that he was picked up by the shooters in the blue Dodge after the shootings occurred.

¶ 75    In my view, the trial court's decision to accept Mr. Grinbarg's unsupported and self-serving testimony that he was never alerted to this defense—over the specific testimony of these six witnesses that he was alerted and did nothing—was manifestly erroneous.