2021 IL App (1st) 182635-U

FIFTH DIVISION
Order filed: May 28, 2021

No. 1-18-2635

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 04 CR 10613 |
| | ) | |
| JUAN GARCIA, | ) | Honorable |
| | ) | Lawrence E. Flood, |
| Defendant-Appellant. | ) | Judge, presiding. |

JUSTICE HOFFMAN delivered the judgment of the court.
Justices Cunningham and Rochford concurred in the judgment.

**ORDER**

¶ 1    *Held*:    We affirm the circuit court's denial of the defendant's postconviction petition after a third-stage evidentiary hearing over the defendant's contention that the circuit court's decision is manifestly erroneous.

¶ 2    The defendant, Juan Garcia, appeals from an order of the circuit court of Cook County, denying his petition filed pursuant to the Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 *et seq.* (West 2010)) after a third-stage evidentiary hearing. On appeal, he argues that the circuit court

erred in denying his petition because his trial counsel's testimony established that counsel provided ineffective assistance by failing to investigate five potential witnesses. For the reasons that follow, we affirm.

¶ 3    The following facts and procedural history were derived from the record and the prior decisions of this court.

¶ 4    The defendant was charged by indictment with, *inter alia*, first-degree murder and attempted first-degree murder following an August 19, 2003 shooting that resulted in the death of Anna Mateo.

¶ 5    At the defendant's jury trial, Maria Mateo testified that, at approximately 11 p.m., on August 19, 2003, she and her seven-year-old daughter, Anna, were outside their home when she heard a sound like firecrackers. Mateo turned and saw Anna lying on the sidewalk, unconscious and bleeding from her head. An ambulance arrived and took Anna to the hospital, where she was pronounced dead. The cause of death was a gunshot wound to the head.

¶ 6    Lori Rincon testified that, on the night in question, she was sitting on the front steps of her parents' house, talking with a man named Randy Edmondson, who was standing on the sidewalk outside the fence. At approximately 12:30 a.m., a car carrying three male passengers approached the house. She stated that she could see the men inside the car because there were "a lot of streetlights on the corner." According to Rincon, the men in the car threw gang signs and spoke to Edmondson, who looked confused and turned his back on the car. The man in the front passenger seat exited the car. She described him as short and Hispanic and estimated he was 14 or 15 years old. In court, she identified the defendant as the car's front passenger. She heard the driver of the car tell the defendant to "buck at him," which she understood as a directive to shoot Edmondson.

The defendant pulled a gun from his pants and ran toward Edmondson, firing three shots in his direction. Rincon went inside and called the police. Over the next few months, she went to the police station on three occasions to view two lineups and a photo array, but she did not identify anyone. Then, on March 3, 2004, she identified the defendant in a photo array as the shooter. Two days later, she identified him after viewing a physical lineup.

¶ 7    Randy Edmondson testified that, in the late evening of August 19, 2003, he was standing outside the gate of Rincon's house, talking with her. A car approached with three Hispanic men inside. Edmondson described the passenger in the front seat as short, with a shaved head and "kind of chubby face." He explained that he could see the occupants of the vehicle because there was "a lot of light" from the streetlamps. In court, he identified the defendant as the passenger. The defendant asked Edmondson if he was a member of the Satan Disciples. Edmondson responded that he was not. The defendant asked if he was sure, and Edmondson replied that he was. At this point, the driver looked at the defendant and said, "Get him." The defendant pulled out a gun and exited the car. Edmondson started running across the street. As he ran in a zigzag pattern, the defendant shot at him eight or nine times. Edmondson stopped running when he saw the defendant run back to the car.

¶ 8    When Edmondson stopped running, a man named Sergio Rojas, whom he knew to be a member of the Satan Disciples, ran up to him carrying a gun. Edmondson told Rojas that he thought members of the Party People street gang, a rival to the Satan Disciples, had just shot at him. Police officers arrived at the scene and started chasing Rojas. According to Edmondson, he lied to the police and told them Rojas' name was Miguel Mendez. Later, at the police station, Edmondson told the police that the shooter looked like Miguel Mendez, whom he knew from high school.

However, when he was shown a photo array, he was unable to identify a picture of Mendez. Edmondson then told the police he thought the shooter was affiliated with the Party People. Eventually, he told the police that the person with the gun who ran off was Rojas, but that Rojas never fired his gun. In December 2003, Edmonson identified someone in a photo array who "looked like" the shooter. On March 4, 2004, he identified the defendant in a photo array as the shooter. The next day, he identified the defendant in a lineup.

¶ 9 Adrian Covarrubias testified that, on August 19, 2003, he and his friend Justin Chapman went to Jose Arteaga's apartment near 18th Street and Loomis, which they called "the Pit." The Pit served as a gathering spot for members of the Latin Counts street gang, of which both Covarrubias and Chapman were members. Covarrubias estimated that he arrived at Arteaga's between 5 or 6:00 p.m. According to Covarrubias, the defendant was at Arteaga's that night, greeting people and throwing the Latin Counts hand signal. Covarrubias had never hung out with the defendant, but he had seen him around and knew he went by the nickname "Little Vamp."

¶ 10 According to Covarrubias, he, Chapman, and the defendant decided to leave Arteaga's together at around midnight. Chapman drove, the defendant sat in the passenger seat, and he sat in the back. After about 20 minutes, Chapman stopped the car at a house near 18th Place and Leavitt, where a man and woman were standing outside. The defendant threw the symbol of the Satan Disciples to lure the man closer. When the man started walking toward the car, the defendant got out and started chasing him. As they ran, the defendant shot at the man five or ten times. The defendant got back in the car and the group returned to Arteaga's. There, they listened to a police scanner. Eventually, he went home. On March 6, 2004, he went to the police station and viewed a lineup. He identified the defendant as the shooter, and he also identified a photograph of the car

they rode in that night. On cross-examination, Covarrubias testified that a man named Sammy Govea rode with him and Chapman when they initially went to Arteaga's on the evening in question. He denied that Govea was in the car with him and Chapman later that evening and denied that Govea was the shooter.

¶ 11    Chicago police officer Abel Orozco testified that he was on patrol in the early morning hours of August 20, 2003, when he heard a rapid succession of gunshots at 12:38 a.m. and headed toward the area where he heard them. As he arrived, he saw a Hispanic man with a handgun come out of a gangway. Officer Orozco gave chase, but the individual escaped through a locked gangway. At that point, Officer Orozco noticed Edmondson in the general vicinity. He also saw a person getting into the passenger seat of a car and noted the car driving away. A citizen approached Officer Orozco and told him a seven-year-old girl had been shot. He called for an ambulance and then spoke with Edmondson, who told him the man with the handgun was named Miguel Mendez.

¶ 12    Chicago police detective John Pellegrini testified, corroborating that Rincon and Edmonson both identified the defendant in a photo array and in a lineup. Detective Pellegrini also testified that the defendant was not in any of the photo arrays or lineups where no one was identified. Following Detective Pelligrini's testimony, the State rested.

¶ 13    Testifying for the defense, Chicago police detective James Hartmann stated that he spoke with Nicholas Macio as part of the investigation into Anna's death. Macio, who was talking on a nearby payphone and witnessed the shooting, gave Detective Hartmann a description of the perpetrator. Macio described the shooter as a skinny, Hispanic male between 4'11 and 5'2 inches tall. Macio told Detective Hartmann that the shooter resembled an individual named Chuckie who went to Juarez High School. Detective Hartmann also testified that his investigation revealed that

Sammy Govea's birthday was February 7, 1983, making him 20 years old when the shooting occurred.

¶ 14    The defendant's mother, Diane Garcia, also testified for the defense. Diane testified that she has four sons: Hector, the defendant, Fabian, and Nicholas. In August 2003, the defendant was 16 years old. According to Diane, during the week of the shooting, her father, Victor Martinico, and his new wife, Coralia, were in Chicago to attend several family gatherings. On the night of August 19, 2003, the family had dinner together at her apartment on the 2400 block of South Pulaski. The defendant was home all day. Diane testified that she and her son Nicholas went to the mall from about 7:00 to 9:20 p.m. Sometime after 9:30 p.m., the defendant and his two brothers, Fabian and Nicholas, retired to their bedroom to play video games. Diane and her father watched television until about 11:20 p.m., at which time her father and his wife said goodbye to the boys and then left for their hotel. Diane went to sleep in the "front room" around 11:45 p.m. because she did not have her own bedroom in the apartment. Diane testified that she did not observe the defendant leave the apartment at any time. The next day, she and the defendant drove Victor and Coralia to the airport. On cross-examination, Diane testified that in August 2003, the defendant was about 5'2 inches tall and had his head close shaven.

¶ 15    The defendant testified on his own behalf, corroborating his mother's testimony that he was at her house at the time of the shooting. He stated that, in August 2003, his grandfather and his wife flew to Chicago to attend family events. The day before they flew back home, he spent all day visiting with them at the apartment where he lived with his mother. He testified that the next day, he and his mother took his grandfather and his grandfather's wife to the airport.

¶ 16    The defendant denied being a member of any street gang, but he acknowledged that his older brother, Hector, was a member of the Latin Counts. According to the defendant, he did not know Arteaga personally, but he knew him to be one of Hector's friends and knew him to live in a place called the Pit. The defendant denied ever having been to the Pit and denied having been involved in the shooting at issue. The defendant testified that he did not know Covarrubias and Chapman personally but had seen them around the neighborhood and talking with Hector.

¶ 17    During a discussion outside the presence of the jury, defense counsel noted that, although the defendant's grandfather was present in the courthouse, the defense had decided not to call him as a witness. The defense then rested.

¶ 18    After closing arguments, the jury found defendant guilty of the first-degree murder of Mateo and the attempted first-degree murder of Edmondson.

¶ 19    At sentencing, the trial court heard arguments in mitigation and in aggravation. The defendant also spoke in allocution, maintaining his innocence. He accused his trial counsel of failing to present "all of the evidence in [his] defense." The defendant specifically faulted his trial counsel for failing to call the following people to testify: Victor, Coralia, Arteaga, and an individual named Reuban Bass. The defendant also faulted his counsel for failing to introduce Victor's bank records, which showed that he was in Chicago at the time of the shooting.

¶ 20    The trial court sentenced the defendant to consecutive prison terms of 50 years for first-degree murder and 6 years for attempted first-degree murder. After which, the prosecutor stated that he wished the record to reflect that the issue of the defendant's grandfather testifying was discussed in chambers prior to the defense resting and it was his understanding that "[t]he decision was made after an interview by the defense attorney." The trial court then asked defense counsel

if he wished to state for the record why he did not call Victor as a witness even though he was present in court during the trial. Counsel responded, "Your Honor, his grandfather Victor Martinico did fly in from the west coast, and I interviewed him prior to him possibly providing testimony in this case, and it was my trial decision not to call Mr. Martinico based on my questioning of him."[1] When the court asked for more facts, counsel explained as follows:

> "Your Honor, I do not wish to go into detail as to his testimony because I know that [defendant] hopes to come back before the court one day, but the reason is that his testimony in part conflicted from the testimony of Diane Garcia who is [defendant's] mother. It was my belief and still is that that would have, that attack of credibility of Ms. Garcia, would have been too detrimental to [defendant's] case. In my opinion, Diane Garcia was an excellent witness, and I did not want to have the jury have now conflicting information and possibly not even believe Ms. Garcia's testimony. That's why I made the decision not to call the grandfather."

¶ 21    On direct appeal, the defendant raised the following arguments: (1) the State failed to prove him guilty beyond a reasonable doubt; (2) he was deprived a fair trial based upon improper closing argument by the prosecutor; (3) he was denied effective assistance of trial counsel because his attorney failed to object to the prosecutor's improper comments during closing argument; (4) he received ineffective assistance of counsel because his attorney failed to present certain evidence and call additional witnesses in support of his alibi defense; and (5) the trial court erred in failing to conduct a *Krankel* hearing on his posttrial claim of ineffective assistance of counsel. We

---

[1] The transcript reflects that both Eric Mitchell and Kunal Kulkarni were present on the defendant's behalf on that date and attributes these responses to Kulkarni.

affirmed the defendant's conviction and sentence. *People v. Garcia,* No. 1-07-0265 (2009) (unpublished order under Supreme Court Rule 23). In so doing, we determined that the defendant's claim of ineffectiveness based on trial counsel's failure to call several witnesses and present other evidence in support of his alibi defense was premature because it was based on matters outside the record. We advised that the issue would be more appropriately addressed in postconviction proceedings. *Id.* at 30-31.

¶ 22    On February 10, 2010, the defendant filed an attorney-drafted petition for postconviction relief under the Act. The petition included an argument that his trial counsel provided ineffective assistance when he failed to interview and call several witnesses who would have corroborated the defendant's alibi defense; namely, Victor; Coralia; and his brothers, Fabian and Nicholas. The defendant also argued that his counsel was ineffective for failing to call Arteaga, whose testimony would have impeached the testimony of Covarrubias and suggested that someone else was the shooter. Finally, the defendant argued that counsel was ineffective for failing to introduce a copy of Victor's credit card statement, showing that he was in Chicago at the time of the shooting. The defendant supported his petition with six notarized affidavits from Diane, Nicholas, Fabian, Victor, Coralia, and Arteaga. He also attached a copy of Victor's credit card statement, showing that he had made purchases in the Chicago area on August 14, 17, 18, and 20, 2003. We will briefly summarize the contents of the attached affidavits.

¶ 23    Victor stated in his affidavit that in August 2003, he and his new wife, Coralia, flew to Chicago to visit with Diane and her sons. On August 19, 2003, he and Coralia spent the day and the evening with Diane's family. Following dinner, Diane and Nicholas went to the store for a few hours. About 11:30 p.m., he and Coralia left to return to their hotel. He averred that the defendant

was present the entire evening. According to Victor, he spoke with the defendant's attorney, informed him he was willing to testify, and flew to Chicago for the trial. He also provided counsel with a copy of his credit card statement, showing he was in Chicago during the time frame in question. Despite being present at trial and willing to testify, counsel did not call him as a witness.

¶ 24    Coralia averred in her affidavit that she was with her husband Victor's family on August 19, 2003. The family spent the entire evening together and she averred that the defendant was present at the house at 11:30 p.m., when she and Victor left for their hotel. She also stated that the defendant's attorney never interviewed her or asked her to testify on his behalf.

¶ 25    Fabian and Nicholas Garcia, the defendant's brothers, averred in separate affidavits that on August 19, 2003, they spent the entire day at home with their family. After their grandfather left late that night, they played video games with the defendant in their shared bedroom and went to bed about midnight. They both averred that the defendant never left the house that evening. According to both brothers, they were willing to testify but were never approached by the defendant's counsel.

¶ 26    Diane averred in her affidavit that prior to trial, she informed defense counsel that the defendant was at home at the time of the shooting, and that this fact could be confirmed by Victor, Coralia, and the defendant's brothers. Diane stated that counsel never asked to speak with the defendant's brothers.

¶ 27    Arteaga averred in his affidavit that, on August 19, 2003, Chapman, Covarrubias, and a man who was introduced to him as "Sammy" came to his home to drink beer. Shortly after midnight, Chapman, Covarrubias, and Sammy left to buy more beer. About 45 minutes later, the group returned without any beer. They asked Arteaga to turn on his police scanner, explaining that

they had just shot at some "SDs," which he understood as a reference to the Satan Disciples street gang. Arteaga made everyone leave his home. Arteaga stated that the defendant was not at his home at any point that night. Arteaga also averred that he spoke with the police and identified Chapman and Covarrubias from a photo array. According to Arteaga, the police told him that the defendant was involved in the shooting, but he repeatedly denied that the defendant was at his house that night. Arteaga also stated in his affidavit that he was contacted by the defendant's attorney, Eric Mitchell, and he related to counsel that the defendant was not among the group of men at his home on the night of the shooting. He averred that he was subpoenaed to testify at the defendant's trial and, although he was at the courthouse, he was not called.

¶ 28    The State filed a motion to dismiss the defendant's postconviction petition, and the circuit court granted the motion. The defendant appealed and we reversed the circuit court's second-stage dismissal. *People v. Garcia*, 2013 IL App (1st) 121006-U. In reaching our decision, we noted that Diane's testimony at trial only provided the defendant with an alibi up to 11:45 p.m., whereas the defendant's brothers averred in their affidavits that they were awake with the defendant until at least midnight. We ultimately concluded that the record did not allow us to determine whether counsel's decision not to call the defendant's witnesses was "a professionally reasonable tactical decision" or "incompetence," and we remanded the matter for a third-stage evidentiary hearing so that the circuit court could "make an informed decision." *Id.* at ¶ 40.

¶ 29    On May 30, 2018, a third-stage evidentiary hearing was held on the defendant's claims of ineffective assistance of counsel. At the evidentiary hearing, he called the following witnesses: Arteaga, Diane, Coralia, Fabian, and Nicholas. Victor, the defendant's grandfather, passed away on June 10, 2015, and was therefore unavailable to testify.

¶ 30    Arteaga testified that, in August 2003, he lived at 1606 South Loomis, which was next to a vacant lot known as "the Pit." At that time, he was a member of the Latin Counts street gang, which is how he came to know Hector, the defendant's brother, who was also a member of the Latin Counts. By virtue of his relationship with Hector, he knew the defendant, but they were not friends. In August 2003, he was at his home with three fellow Latin Counts: Jorge Cervantes, Covarrubias, and Chapman. Also present that night was an individual named Sammy, who arrived with Covarrubias and Chapman. According to Arteaga, everyone arrived at approximately 11:00 p.m., and an hour later, they ran out of beer. Chapman, Covarrubias, and Sammy elected to leave and get more alcohol. Arteaga estimated that they were gone for 30 to 45 minutes. When they returned, Chapman and Covarrubias told him to turn on his police scanner because they had just shot at members of a rival gang. He did so and heard a report that shots had been fired. He told the three of them to leave, which they did. He testified that the defendant was not at his residence that night.

¶ 31    According to Arteaga, six months later, the police came to his residence to speak about that night. Around that time, he also learned that the defendant had been arrested for the shooting. He met with the defendant's attorney, who he stated had the last name Mitchell, prior to the trial. The meeting occurred at a restaurant on 18th Street. Arteaga testified that he related to counsel that the defendant was not present at his house on the night of the shooting. Mitchell told him to come to court because he was going to call him to testify. Arteaga stated that he was not subpoenaed to testify, but he was present and willing to testify during the trial. Mitchell, however, approached him and told him to leave. On cross-examination, he testified that he could not remember if he told the police that Sammy was there that night. He acknowledged that he refused to speak with the

State's Attorney investigators when they visited his house a few months after the shooting occurred.

¶ 32    Diane testified that she hired Mitchell as the defendant's attorney about a month after his arrest. She met with him in April 2004 at his law offices in Joliet, where she explained that she found a flyer for a family reunion while unpacking from a recent move, which triggered her memory of the entire week. The flyer listed the date of the family reunion as the weekend before the shooting. She related to Mitchell that, on the day of the shooting, she was at home with Victor, Coralia, and three of her sons: the defendant, Nicholas, and Fabian. She recalled Mitchell being excited about the evidence and expressing optimism. Subsequently, Diane received a copy of Victor's bank statement showing that he made purchases in Chicago during the week of the shooting. She gave the statement to Mitchell about two months after hiring him. She recalled that Mitchell told her that the bank statement was "good evidence." Diane believed that Mitchell made one phone call to Victor, and she did not know whether they ever spoke in person. To her knowledge, Mitchell did not interview Coralia, Fabian, or Nicholas. Mitchell told her that the investigator he hired went to her neighborhood once but left because he was frightened of the area.

¶ 33    Coralia testified that her husband Victor passed away in 2015. She first met the defendant during a trip to Chicago in 2003 to attend Victor's family reunion. She arrived in Chicago on August 15, 2003, and the reunion was the next day. She and Victor flew home to San Francisco on August 20, 2003. On August 19, 2003, she and Victor were at Diane's house spending time with the defendant, Fabian, and Nicholas. She estimated that she and Victor arrived at around 8:00 a.m. and did not leave until around midnight. According to Coralia, the only time any one left that day was a brief period from 7 to 9:00 p.m. when Diane and Nicholas went out. Hector, Victor's

oldest grandson, arrived later in the evening with his father, who came in to say goodbye to the couple and then left. Eventually, Victor fell asleep, and the defendant, Nicholas, and Fabian began playing video games in the dining room. Around 10 p.m., the three brothers left the dining room and Coralia fell asleep. She awoke just before midnight and, noting the time, she asked Diane to wake Victor. When Victor awoke, he asked where the boys were, and went up to their room to say goodbye. Coralia testified that it was about midnight when they left and that all three boys were in their room at the time. Coralia testified that she was never contacted by the defendant's trial counsel about the case. She and Victor flew to Chicago to attend the defendant's trial.

¶ 34    On cross-examination, Coralia testified that the defendant's counsel spoke with Victor in the hallway of the courthouse, but she did not know what they discussed. She stated that counsel did not have a phone conversation with Victor. She acknowledged that she signed an affidavit for the defendant's postconviction petition in which she averred that she and Victor left Diane's house at 11:30 p.m., though she stated she did not remember signing it.

¶ 35    Fabian testified that he is three years younger than the defendant. He explained that, in 2003, his parents were separated, and he and his brothers split their time between their respective homes. When they stayed at their mother's house, he, Nicholas, and the defendant shared one bedroom and Hector, the oldest brother, slept in the other bedroom. He testified that, on August 19, 2003, he was at his mother's house with his brothers, Nicholas and the defendant. It was the last day that Victor and his wife, Coralia, were in town, and they all planned to spend the day at his mother's house, which they did. During the evening, he played video games with the defendant and Nicholas. At around 9:00 p.m., Hector arrived with their father. His father said hello to Victor and then left. Fabian estimated that Victor and Coralia left around 10:30 or 11:00 p.m. Before they

left, they came to say goodbye to him and his brothers in their room where they were playing video games. Fabian stated that he played video games with his brothers until "probably" sometime between 11 p.m. and midnight. He testified that the defendant never left the house that night. According to Fabian, the defendant's trial counsel never spoke to him about testifying at the trial. On cross-examination, Fabian acknowledged that he was 13 years old in 2003 and in the eighth grade. He admitted that he had three felony convictions from 2010 and 2011 for possession of cannabis between 30 and 500 grams. Fabian denied he was ever a member of a gang.

¶ 36   Nicholas testified that, on August 19, 2003, he was at his mother's home with the defendant, Fabian, Victor, and Coralia. After eating breakfast, he played video games and went outside in the backyard to play football with his two brothers. Later in the day, he went to the mall with his mother for an hour. When they returned, his older brother, Hector, and his father had also come over to visit with Victor and Coralia. His father left not long after he returned from the mall with his mother. Victor and Coralia also left shortly thereafter. He, Fabian, and the defendant then went into their shared bedroom and played video games. He estimated that he went to bed around 10:00 p.m., which was after his grandfather left. Nicholas stated that he knew "for a fact that" the defendant did not leave the house that night. Nicholas was asked about the sleeping arrangements at his mother's house, and he explained that the house had two bedrooms, one he shared with his brothers and the other belonged to his mother. He stated that Hector "would sleep on the couch." Nicholas testified that he never spoke with trial counsel about the defendant's whereabouts on the night in question, but he would have testified if he were asked. On cross-examination, Nicholas testified that he was 13 years old in 2003 and was in seventh grade. He acknowledged that he did not attend the defendant's trial. He also admitted that he had a 2011 felony conviction for burglary.

¶ 37    The defendant testified that he was arrested on March 5, 2004, and shortly thereafter, his mother hired Eric Mitchell to represent him. He had a brief meeting with Mitchell in the bullpen of the lockup behind the courtroom to discuss his case. He gave Mitchell his potential alibi witnesses: Victor, Coralia, Diane, and his two brothers. Mitchell told him that he would call them in his defense. He continued to have meetings with Mitchell for 5 to 10 minutes at a time in the bullpen before court. Mitchell only visited him in prison once, which was the week before trial. Mitchell told him that his alibi witnesses were not needed at trial because the State's case was weak. The defendant testified that, to his knowledge, Mitchell never interviewed Fabian, Nicholas, or Coralia.

¶ 38    On cross-examination, the defendant stated that, when police arrested him in March 2004, they did not ask him where he was the night of the shooting. The police told him that he was there for a shooting that occurred in August, but he did not remember if they had given him the date of the shooting. He did not remember or realize that he was at home at the time of the shooting when he was first arrested.

¶ 39    The State presented Eric Mitchell, the defendant's trial counsel. Mitchell testified that he was a practicing attorney and had been licensed for over 20 years. In 2004, he was hired by the defendant's mother to represent him. After he was hired, he spoke with the defendant both at his court dates and during a visit to the jail. Mitchell also testified that he had numerous conversations with the defendant's mother. He recalled a particular conversation, which occurred at a Mexican restaurant within four miles of the courthouse. Also present at that meeting was Arteaga, who he described as a potential witness in the case. Based on the conversations he had with the defendant's

mother, Mitchell determined that he was going to rely on the State's failure to prove its case beyond a reasonable doubt and also raise an alibi defense.

¶ 40    Mitchell testified that he conducted an investigation into the defendant's alibi, which he described as "very thorough." He stated that he spoke with "many individuals," though he could not recall all of their names. He also stated that he had two other attorneys working on the case and an investigator, whom he described as a former detective in the Chicago Police Department. According to Mitchell, the attorneys and investigator also spoke with potential witnesses. Mitchell stated that the defendant also provided him a list of people he wished Mitchell interview. Mitchell did not know whether he spoke with all of the people the defendant recommended, but he did speak with those he thought were relevant.

¶ 41    Mitchell acknowledged that the defendant provided him with a list of family members to interview who could provide him an alibi. Regarding Victor, Mitchell stated that he spoke with him "at least two or three times" both in person and over the phone. Mitchell spoke with Victor about the day of the shooting and the surrounding days as well, at which point he became "concerned" that Victor was either lying or had memory issues. Mitchell testified that he was afraid that such a poor witness would "completely crumble" the credibility of Diane's testimony. Mitchell also stated that Victor's testimony would not have added to Diane's because neither of them "[had] their eyeballs" on the defendant at the time of the shooting. Mitchell explained that he ultimately chose to proceed with Diane and not Victor because, while Diane was an "excellent" witness and "very credible," Victor was "the exact opposite." According to Mitchell, he told the defendant his reasons for not calling Victor and, although the defendant did not like his decision, "he eventually agreed." Regarding Victor's bank statement, Mitchell testified that he did not recall

seeing that document and did not believe he ever received it. The parties stipulated, however, that a copy of the bank statement was in Mitchell's file. Regarding Coralia, Mitchell testified that he recalled speaking with her on the phone, but he did not recall the substance of that conversation.

¶ 42    Mitchell was also asked about why he chose not to call the defendant's brothers. He testified that he spoke with Diane about possibly including her other children in the defense. Regarding her youngest son, Nicholas, she told Mitchell that "it may not be ideal" to involve him. Mitchell testified that he also spoke with the defendant about the matter. Mitchell ultimately agreed with Diane's opinion that Nicholas should not testify. Regarding Fabian, Mitchell stated that he could not recall why he chose not to call Fabian, but he "probably" did not believe his testimony would add to Diane's. He stated that "someone definitely would have spoken with him," but he could not recall whether it was him or another attorney working the case with him. He recalled that Fabian was "maybe 13, 14."

¶ 43    Mitchell testified that he met with Arteaga in person at least once and spoke with him over the phone multiple times. He recalled his initial impression was that Arteaga "was going to be a good witness for us" because Arteaga told him that it was Chapman, Covarrubias, and a third individual who left in a vehicle that night, not the defendant. Mitchell explained that, closer to trial, Arteaga "sort of flipped on me" and indicated that he was going to provide harmful testimony that would implicate the defendant, at which point Mitchell decided not to call him.

¶ 44    On cross-examination, Mitchell was asked to provide specific details as to why he did not call each of the witnesses who testified at the evidentiary hearing. With regard to the defendant's younger brothers, Mitchell stated that he did not call them to testify, in part, because of their age, but he also "accepted" Diane's opinion "because she knows her sons" better than he did. When

asked who made the decision not to call Fabian, Mitchell stated that, in his opinion, the defendant "ultimately" made the decision as to which witnesses would testify based on his "legal recommendation." With regard to Victor, Mitchell stated that he did not find him credible because he had difficult answering "easy questions," such as who took him to the airport the following morning and which airport he used. Mitchell acknowledged that the notes in his file did not state any reason for why he made the decision to not call Victor to testify. When asked why he chose not to call Coralia, Mitchell stated that he made the decision because she was not "interacting" with the defendant at the time of the shooting, and he did not think she would add anything to Diane's testimony. Regarding Arteaga, Mitchell testified that the notes in his file did not indicate that Arteaga had "flipped" on the defendant, but he estimated that it occurred "close to trial." Mitchell explained that when he testified earlier that Arteaga "flipped," he meant that his testimony "was not going to be as beneficial" as he had previously thought, not that he was going to testify on behalf of the State. Mitchell also explained that, in his experience, there is a danger associated with "compounding" the testimony of an "excellent witness" because if a witness deviates from your "main witness" it could damage the credibility of the entire defense in the eyes of the jury.

¶ 45     On redirect-examination, Mitchell testified that he was also aware that his only alibi witnesses were the defendant's family members, which provided the State an opening to attack their credibility. He stated that he "would have loved" if he had an alibi witness who was not a member of the defendant's family. He also reiterated that none of the alibi witness had "eyeballs" on the defendant at the time the shooting occurred. On recross-examination, Mitchell testified that he recalled that the defendant shared a bedroom with one of his brothers, but he did not recall which one.

¶ 46    The parties then stipulated Detective Robert Rodriguez would testify that Arteaga was in the Area 4 Detective Division on March 5, 2004 at approximately 9:30 a.m. where he was questioned about the shooting death of Mateo. Detective Rodriguez told Arteaga that they had information that he was told of the shooting after it occurred, and showed him a photo array that included photos of Covarrubias, Chapman, and himself. Arteaga told Detective Rodriguez that he was not told of the shooting immediately after it occurred and that he did not recognize any of the individuals in the photo array. After speaking to an attorney, who agreed that Arteaga would cooperate in the investigation, Arteaga told Detective Rodriguez that he and some friends were drinking at an area behind his house called the Pit. A four-door Oldsmobile pulled up with two Latin Counts from Cicero bragging that they just burned a Satan Disciple around 18th Street. Arteaga was shown the same photo array as before and he identified photos of Covarrubias and Chapman as the Latin Counts that were bragging. When asked about a third person in the car, Arteaga stated he did not see anyone else in the car.

¶ 47    Detective Rodriguez confronted Arteaga with information that the defendant was identified by several witnesses as the shooter, and Arteaga stated that he could not remember who exactly was present, but he knew some fellow Latin Counts from Cicero were there. Arteaga stated that, after Chapman and Covarrubias arrived, they went inside and turned on his police scanner. They heard a report of shots fired on 18th Place, and a few minutes later, the scanner reported a girl shot on 18th Place. Detective Rodriguez asked Arteaga what the defendant was doing at that time and Arteaga stated that he could not recall if he was present. Arteaga stated that he did not personally know if the defendant was involved in the shooting. Arteaga's attorney came back to the station and Arteaga repeated the same account in his presence. Arteaga was shown the same photo array

as before, and he circled photos of Chapman and Covarrubias. In a second array, a photo of the defendant was included, but Arteaga refused to look at that array.

¶ 48    The parties also stipulated that the defendant was taken to Area Four Detective Division, and at approximately 4:45 p.m., Diane arrived there. Detectives told Diane why the defendant was arrested, and she spoke to the defendant alone for 15 minutes. Diane then left and told detectives not to speak to the defendant until an attorney could be retained. At 7:00 p.m., Diane returned with an attorney, and stayed with the defendant in the interview room after that attorney left. At no time while at Area Four did Diane tell the police that the defendant was at home with her on the night of the shooting.

¶ 49    It was further stipulated that Investigators Moreno and Perez from the State's Attorney's Office would testify that they attempted to contact Diane and left their business cards with a neighbor. The investigators received a phone call from Diane inquiring why they wanted to speak to her, and she was told it was regarding her son's alibi. Diane told them she would talk to her attorney and then call them back. The investigators were contacted again by Diane and she said she had spoken to her attorney and she would not be speaking to them regarding the matter.

¶ 50    The defendant called Diane to testify in rebuttal. She testified that she had conversations with Mitchell regarding Nicholas, but she denied telling him that she did not want Nicholas to testify in the defendant's case. On cross-examination, she testified that Nicholas was "about" 12 years old when she first met with Mitchell.

¶ 51    After hearing arguments, the circuit court denied the defendant's petition. The court found that "it was clear that all [of the defendant's additional witnesses] had inconsistent recollections of the time and events on the night of the shooting. If they were called as witnesses, it is evident that

there would have been problems with their alibi defense testimony." The court went on to find that Arteaga's testimony was not credible and that he was impeached by what he told police when he was questioned at the station. The court stated that counsel's representation was not objectively unreasonable under the first prong of *Strickland* because "[t]he evidence established that counsel either interviewed or investigated the potential alibi witnesses. The decision not *** to call them was a matter of trial strategy." In conclusion, the court stated:

"There is the possibility of cumulative evidence if he would have called all of those alibi witnesses and all their family members, and there is *** the issue of potential bias, coupled with the fact that, *** in listening to their testimony regarding what occurred that particular evening, there is inconsistencies as far as times and where people were sleeping in the house. All of that would have been presented at trial and I think would have affected the presentation of evidence in the defense."

¶ 52     This appeal followed.

¶ 53     On appeal, the defendant argues that the circuit court erred in dismissing his petition after a third-stage evidentiary hearing because Mitchell's testimony demonstrates that his decision not to call any of the five proposed witnesses was not the product of sound trial strategy. He contends that the circuit court's finding otherwise is manifestly erroneous.

¶ 54     The Act establishes a process by which those under criminal sentence can assert that their convictions were the result of a substantial denial of their rights under the United States Constitution or the Illinois Constitution or both. *People v. Tate*, 2012 IL 112214, ¶ 8. A postconviction proceeding contains three stages. *Id.*, ¶ 9. At the first stage, the circuit court must independently review the postconviction petition and determine whether "the petition is frivolous

or is patently without merit." *People v. Hodges*, 234 Ill. 2d 1, 10 (2009). The court must dismiss the petition in a written order if it determines the petition is either frivolous or patently without merit. *Id.*

¶ 55     If the circuit court does not dismiss the petition at the first stage, it advances to the second stage. *People v. Domagala*, 2013 IL 113688, ¶ 33. At the second stage, counsel is appointed to represent the defendant, if necessary, and the State may move to dismiss or answer the petition. *Id.* At this stage, the defendant bears the burden of making a substantial showing of a constitutional violation. *People v. Pendleton*, 223 Ill. 2d 458, 473 (2006). If no such showing is made, the petition will be dismissed. *People v. Edwards*, 197 Ill. 2d 239, 246 (2001). However, if a substantial showing of a constitutional violation is made, then the petition advances to the third stage, where the circuit court conducts an evidentiary hearing. *Id.*

¶ 56     At the third stage evidentiary hearing, the burden of proof is upon the petitioner to show a denial of a constitutional right by a preponderance of the evidence. (Internal quotation omitted.) *People v. Coleman*, 2013 IL 113307, ¶ 92. Following an evidentiary hearing where fact-finding and credibility determinations are involved, this court will not reverse the circuit court's decision unless it is manifestly erroneous. *Pendleton*, 223 Ill. 2d at 473. Manifest error is error that is "clearly evident, plain, and indisputable." *People v. Beaman*, 229 Ill. 2d 56, 74 (2008) (quoting *People v. Morgan*, 212 Ill. 2d 148, 155 (2004)).

¶ 57     Here, the defendant was granted an evidentiary hearing to determine whether his trial counsel was ineffective for failing to investigate or call four alibi witnesses and an occurrence witness to testify at his jury trial.

¶ 58     A criminal defendant has the right to the effective assistance of counsel under both the United States and Illinois constitutions. *Strickland v. Washington*, 466 U.S.668, 690-91 (1984); *People v. Albanese*, 104 Ill. 2d 504, 525 (1984). In determining whether a defendant was denied effective assistance of counsel, this court applies the familiar two-prong test set forth in *Strickland*. A defendant must demonstrate that (1) trial counsel's representation was deficient and (2) the deficient performance prejudiced the defendant. *Domagala*, 2013 IL 113688, ¶ 36. If a defendant fails to establish either prong, his claim of ineffective assistance of counsel fails. *People v. Colon*, 225 Ill. 2d 125, 135 (2007).

¶ 59     In reviewing a claim of ineffective assistance of counsel, this court reviews counsel's actions under the totality of the circumstances of the individual case. *People v. Shatner*, 174 Ill.2d 133, 147 (1996). Judicial scrutiny of counsel's performance is highly deferential, and counsel's trial strategy is given a strong presumption of reasonable professional assistance. *Strickland*, 466 U.S. at 689. To establish deficient performance, the defendant must identify counsel's acts or omissions that allegedly are not the result of reasonable professional judgment and overcome the strong presumption that counsel's action or inaction was the result of sound trial strategy. *People v. Perry*, 224 Ill. 2d 312, 341-42 (2007); *Strickland,* 466 U.S. at 690. "A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Strickland*, 466 U.S. at 689. The defendant must show that counsel's errors were so serious and his performance was so deficient that he did not function as the counsel guaranteed by the sixth amendment. *Perry*, 224 Ill. 2d at 342.

¶ 60    Decisions regarding which evidence to present and which witnesses to call are matters of trial strategy (*People v. Hamilton*, 361 Ill. App. 3d 836, 847 (2005)), and counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary (*People v. Pecoraro*, 175 Ill. 2d 294, 324-25 (1997)). Where circumstances known to counsel at the time do not reveal a sound basis for further inquiry in a particular area, it is not ineffective for the attorney to forgo additional investigation. *People v. Orange*, 168 Ill. 2d 138, 150 (1995). Strategic choices made by counsel after having made a thorough investigation are "virtually unchallengeable." *People v. Towns*, 182 Ill. 2d 491, 514 (1998).

¶ 61    Here, the defendant raises several arguments challenging the circuit court's finding that Mitchell's conduct was not ineffective because he conducted a sufficient investigation and his decision not to call the proposed witnesses was a matter of trial strategy. Specifically, the defendant argues that the court's findings are not supported by the record because Mitchell's explanations as to why he chose not to call the proposed witnesses were either vague and inconsistent or objectively unreasonable. The defendant also challenges the credibility findings the court made with regard to his witnesses. The State responds that Mitchell testified extensively regarding his reasons for not calling the five proposed witnesses and his testimony established that he conducted a reasonable investigation into the witnesses and his decision not to call them was a matter of trial strategy, which is virtually unchallengeable. We agree with the State.

¶ 62    At the defendant's trial, Mitchell chose to present the defendant's alibi—that he was at his mother's house all night with other family members—through Diane's testimony. Mitchell was questioned extensively at the evidentiary hearing regarding his choice to call only Diane and not

the other family members present that night. Although Mitchell had difficulty remembering certain specifics about conversations that occurred 12 years ago, he did provide some details explaining his decisions with regard to each proposed witness. Mitchell testified that he had multiple people working on the defendant's case, including other attorneys and an investigator, and that they spoke with all of the proposed witnesses, save for Nicholas. The record is unclear if Mitchell or any of his subordinates spoke with Nicholas, but Mitchell did testify that he spoke with Diane and the defendant about whether to include Nicholas in the defense prior to determining not to call him as a witness.

¶ 63    Additionally, Mitchell explained that several factors went into his decision to proceed with Diane as the only alibi witness. First, he felt that Diane was an excellent witness who testified credibly, and he feared that presenting duplicative alibi witnesses who did not add to her testimony might invite the jury to scrutinize minor discrepancies in their version of events. Another factor he considered was the fact that none of the proposed alibi witnesses, including Diane, could testify that they saw the defendant at the time of shooting, and so he felt they did not add to Diane's testimony. He also factored in that all of the alibi witnesses were the defendant's family members, which left them open to attack by the State. The circuit court credited Mitchell's testimony, finding that he either interviewed or investigated all five potential witnesses and that his decision not to call them was a matter of trial strategy. The court also found that Arteaga was not credible and that Coralia, Fabian, and Nicholas testified inconsistently about specific details such that their testimony would not have helped the defense at trial.

¶ 64    Regarding Arteaga, Mitchell testified that they spoke on multiple occasions, including an in-person meeting at a restaurant with Diane, and he believed until very late in the process that

Arteaga would be a key witness for the defense. However, during a conversation with Arteaga shortly before trial, Mitchell became concerned that Arteaga's testimony would not be as beneficial as he once believed. When asked what specifically changed in Arteaga's testimony that gave him that impression, Mitchell stated that he could only give his "general opinion" that the testimony would be unhelpful. The circuit court, after hearing the evidence, credited Mitchell's testimony and found Arteaga to have been impeached by the stipulated testimony that he did not, in fact, tell detectives that the defendant was not at his apartment on the night in question.

¶ 65    After reviewing the record, we cannot say that the circuit court's finding that Mitchell investigated or interviewed each of the defendant's proposed witnesses and chose not to call them as a matter of trial strategy is a clearly evident, plain, or indisputable error.

¶ 66    In reaching this conclusion, we are not persuaded by the defendant's argument that Mitchell's testimony as to why he chose not to call each witness was vague, inconsistent, or unsupported by the record. The defendant primarily faults Mitchell for being unable to recall all of the specific reasons he had for not calling each witness and for the lack of interview notes for certain witnesses in his trial file. We note again that the circuit court heard the testimony and is responsible for making credibility determinations and weighing the evidence. *People v. Domagala*, 2013 IL 113688, ¶ 34. That said, the defendant's arguments ignore that Mitchell testified repeatedly that one of the main reasons he chose not to call the other family members is that none of them could provide the defendant with an alibi at the precise time of the shooting. Based on the testimony at the evidentiary hearing, Mitchell's recollection of that fact was correct. No witness testified that they saw the defendant at approximately 12:30 a.m. on the early morning of August 20, 2003. Mitchell also testified that he was concerned that if he called duplicative witnesses,

Diane's credibility might be undermined in the eyes of the jury if those witnesses provided inconsistent testimony. Here too, his concern was apparently valid because Coralia, Fabian, and Nicholas each testified inconsistently regarding certain details of that night. For example, Nicolas testified that they lived in a two-bedroom home and that he and his brothers were in one room and his mother was in the other. But Diane and Fabian both testified that the other room was Hector's and Diane did not have a room in the house. Coralia, Nicholas, and Fabian also all disagreed about when Victor and Coralia left and when the boys went to sleep. Nicholas testified that they left at 10:00 p.m. and all the brothers went to sleep shortly thereafter, whereas Coralia testified they did not leave until midnight. The circuit court noted these discrepancies and found that, if the jury heard this testimony, it would have possibly harmed the defense. Lastly, Mitchell did testify regarding specifics where he could recall them, such as his recollection that Victor, the witness the defendant felt most passionately about calling, had difficulty answering easy questions about his trip to Chicago. We therefore find that the defendant's argument in this regard is unavailing.

¶ 67    The defendant also contends that Mitchell's explanation for why he chose not to call Nicholas was objectively unreasonable. Specifically, he argues that Mitchell's admission that he chose not to call Nicholas, in part, at Diane's behest is unreasonable because Mitchell's duty under the sixth amendment was to the defendant, not Diane. We find that the defendant's characterization of Mitchell's testimony on this matter to be an oversimplification. Mitchell testified that he spoke with Diane about incorporating her children into the defense, and she expressed her opinion that "it may be ideal" not to call her youngest son, Nicholas, to testify. Mitchell also spoke to the defendant about calling Nicholas. Mitchell ultimately decided that he agreed with Diane and did not call Nicholas, explaining that he credited Diane's input on the subject because she knew her

children better than him. Mitchell also testified that Nicholas's age was a factor in his decision. Simply put, Mitchell did not testify that he was following Diane's orders when he chose not to call Nicholas, but rather, he sought her advice, as well as the defendant's, and agreed with her opinion.

¶ 68    The defendant lastly argues that Mitchell's explanations for why he chose not to call the other family members were objectively unreasonable because he only viewed them individually without considering the cumulative impact of their testimony. In support of his contention, the defendant cites to the Seventh Circuit decision in *Raygoza v. Hulick*, 474 F.3d 958 (2007). In *Raygoza*, the defendant was found guilty of first-degree murder following a bench trial. *Raygoza*, 474 F.3d at 961. During the trial, the State presented three eyewitnesses who identified the defendant as the shooter. *Id.* at 959-60. The defense argued that the defendant had an alibi—he was at a party an hour away from the scene on the night of the shooting—and called the defendant's girlfriend to testify. *Id.* at 961. The defendant argued that his trial counsel was ineffective for failing to investigate and present seven additional alibi witnesses. *Id.* The Seventh Circuit agreed, finding that his trial counsel was ineffective. *Id.* In reaching its decision, the court found that several of the proposed witnesses were not related to the defendant and that one witness would have placed the defendant at the party approximately 30 minutes before the shooting, making it impossible for him to have been at the crime scene an hour away when the shooting occurred. *Id.* at 964. The court faulted trial counsel for "pick[ing] off each" witness for having vulnerabilities without considering their potential cumulative impact. *Id.*

¶ 69    We find *Raygoza* distinguishable from the instant case. Here, unlike in *Raygoza*, the potential alibi witnesses did not include individuals who were not related to the defendant and none of the proposed witnesses could account for the defendant's whereabouts at the time of the

shooting. Moreover, Mitchell testified that he did consider the possibility of providing cumulative testimony, but, in his experience, such a strategy was dangerous because the jury could scrutinize minor discrepancies in the testimonies. As the court said in *Raygoza*, "it is the facts of the particular case, and the particular alibi defense, that matter." *Raygoza*, 474 F.3d at 963. And in the instant case, the defendant's alibi was presented in full through Diane's testimony and no other witness could testify to material additional details.

¶ 70    In sum, we conclude that the circuit court's finding that the defendant failed to establish by a preponderance of the evidence that his trial counsel was ineffective is not manifestly erroneous, and therefore, we find no error in the circuit court's denial of the defendant's postconviction petition.

¶ 71    For these reasons, we affirm the judgment of the circuit court of Cook County.

¶ 72    Affirmed.